UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ACCURACY IN MEDIA, INC.<br>4350 East West Highway<br>Suite 555<br>Bethesda, MD  20814, | ) ) ) ) ) | |
| and | ) ) | |
| ROGER L. ARONOFF<br>5500 Friendship Boulevard<br>Chevy Chase, MD  20815, | ) ) ) ) | |
| and | ) ) | |
| CAPTAIN LARRY W. BAILEY, USN, (Ret.)<br>103 Pamlico Place<br>Chocowinity, NC  27817, | ) ) ) ) | Civil Action No. |
| and | ) ) | |
| LIEUTENANT COLONEL KENNETH<br>      BENWAY, USA, (Ret.)<br>8 Martin Way<br>Whispering Pines, NC  29327, | ) ) ) ) ) | |
| and | ) ) | |
| COLONEL RICHARD F. BRAUER, JR.,<br>      USA, (Ret.)<br>24 Country Club Road<br>Shalimar, FL  32579, | ) ) ) ) ) | |
| and | ) ) | |
| CLARE M. LOPEZ<br>1901 Pennsylvania Avenue, NW<br>Suite 201<br>Washington, DC  20006, | ) ) ) ) ) | |
| and | ) ) | |
| ADMIRAL JAMES A. LYONS, JR.,<br>      USN, (Ret.)<br>9481 Piney Mountain Road | ) ) ) | |

Warrenton, VA  20186,                          )
                                               )
      and                                            )
                                               )
KEVIN MICHAEL SHIPP                             )
636 9th Avenue North                            )
Jacksonville Beach, FL  32250,                  )
                                               )
      Plaintiffs,                                  )
                                               )
      v.                                            )
                                               )
DEPARTMENT OF DEFENSE AND ITS                   )
COMPONENTS DEPARTMENT OF                        )
THE ARMY, NAVY DEPARTMENT,                      )
DEPARTMENT OF THE AIR FORCE,                    )
MARINE CORPS, EUROPEAN COMMAND,                 )
CENTRAL COMMAND, AFRICA                         )
COMMAND, SPECIAL OPERATIONS                     )
COMMAND, OFFICE OF SECRETARY OF                 )
DEFENSE AND JOINT STAFF, DEFENSE                )
INTELLIGENCE AGENCY                             )
100 Defense Pentagon                            )
Washington, DC 20301-1000,                      )
                                               )
      and                                            )
                                               )
DEPARTMENT OF STATE,                            )
2201 C Street, NW                               )
Washington, DC  20520,                          )
                                               )
      and                                            )
                                               )
DEPARTMENT OF JUSTICE AND ITS                   )
COMPONENT FEDERAL BUREAU OF                     )
INVESTIGATION                                   )
950 Pennsylvania Avenue, NW                     )
Washington, DC  20530-0001,                     )
                                               )
      and                                            )
                                               )
CENTRAL INTELLIGENCE AGENCY,                    )
Washington, DC  20505,                          )
                                               )
      Defendants.                                  )
_____)

**COMPLAINT FOR INJUNCTIVE RELIEF**
**(Freedom of Information Act, 5 U.S.C. § 552, as amended)**

PRELIMINARY STATEMENT

In March of 2011, Christopher Stevens became the Unites States Special Representative to the anti-Gaddafi rebels' political organization, the Libyan Transitional National Counsel, based in Benghazi.  Among Stevens' activities was to create a program to collect surface-to-air missiles, or SAMs, fired via man-portable air-defense systems, or MANPADS.

On Tuesday, September 11, 2012, Ambassador Stevens' final scheduled meeting in Benghazi was with the Turkish consul general, Ali Akin.  That evening, at 9:32 p.m., dozens of attackers, armed with assault rifles and anti-tank rocket-propelled-grenades, swarmed the gate at the State Department's Benghazi Special Mission Compound, which, at the time, housed seven Americans.  Moving with military tactics, the invaders lobbed a grenade into the Mission's command post, and then fired AK-47's into its main doorway.  Eventually, their numbers swelled to more than 60.

Within minutes, Ambassador Stevens called his second in command, in Tripoli, Deputy Chief of Mission Greg Hicks.  "Greg, we're under attack."  Hicks immediately called the CIA Chief in Tripoli, the operations Center at the State Department in Washington, and the CIA's Benghazi facility, the "CIA Annex," the Agency's secret headquarters in Benghazi.  Days earlier, a sheet of paper had been posted at the CIA Annex stating, "Be advised, we have reports from locals that a Western facility or US Embassy/Consulate/Government target will be attacked in the next week."

One purpose for maintaining the CIA Annex was to buy back, through Qatari cut-outs, as many MANPADS as possible, for $125,000 or more each.  Thousands had been looted from Qaddafi's stockpiles.  Many of those recovered were loaded onto covered trucks and sent to the Libyan ports in Benghazi and Tripoli for onward shipping to Turkey and ultimate delivery overland to Syrian rebels.

Locked inside the Mission's Technical Operation Center, Alec Henderson alerted the CIA Annex, Embassy Tripoli, and the State Department Operations Center in Washington about the attack.  Henderson stayed in contact, as did Hicks, while the Tripoli Defense Attaché kept African Command and the Joint Chiefs of Staff informed.  Word quickly reached Defense Secretary Leon Panetta and chairman of the Joint Chiefs of Staff General Martin Dempsey.

Global conference calls included European Command, Central Command, Special Operations Command, Transportation Command, and the Army, Navy, Air Force, and Marines.  Thirty-three minutes into the attack, at 4:05 p.m. Washington

time, State's Operations Center issued an alert to the White House Situation Room, the FBI, and the Office of the Director of National Intelligence, among other key government and intelligence offices.  An "OPREP-3 Pinnacle Report" alerted the Pentagon's National Military Command Center.  By the time that Africa Command's reconnaissance drone arrived overhead, ninety minutes into the siege, the attackers had set multiple fires.

Within five minute of Henderson's first call to the CIA Annex, five of the Agency's Quick Reaction Force there had "jocked up" and assembled in two armored cars, ready to go.  But the CIA Chief of Base, who was in charge, forbade the rescuer's departure while he spoke by phone with officials.  Perhaps the CIA's primary concern was not blowing its cover and being forced to reveal or explain its presence in Benghazi.  After being ordered to stay in place at least three times, when they heard Henderson plead, "If you guys do not get here, we're going to die," the rescuers disobeyed orders, and "moved to the sound of the guns" a half mile away, which they could hear in the distance.  Later, most, if not all, of these rescuers would opine that Ambassador Christopher Stevens and Sean Smith would have lived but for the 23-minute delay.

US officials were informed when Tyrone Woods and six others, most of whom were heavily armed, left the CIA's facility, and when they arrived at the Mission.  Soon after these rescuers discovered that Sean Smith had died from smoke inhalation, but that Ambassador Stevens could not be found.  Washington was told this, whereupon decision-makers likely surmised that the US may be faced with a hostage crisis.  Updates included that the group of 14 Americans at the Mission had made a break for the CIA Annex, in two armored SUV's, barely successfully.  They had been targeted by multiple machinegun attacks as they fled.

Officials worldwide were informed when the seven-man Tripoli Task Force rescue team arrived at the CIA Annex, and that Glen Doherty had joined Tyrone Woods on the roof of the CIA headquarters building, and began defending the 28 Americans on site.  Washington was apprised in real time when the CIA Annex was hit with rocket-propelled grenades, bombs, and intense firefights.   And Washington knew when the attackers fired, in rapid succession, five seven-pound 82-mm mortar rounds at the Americans.  The third and fourth rounds hit the roof of the CIA headquarters building, killing Tyrone Woods and Glen Doherty instantly, and seriously wounding two others.  The Americans had averted a tragedy on a larger scale during the eight-hour siege only by performing extraordinary acts of courage and heroism.

At the time, a 130-man Marine Force Reconnaissance force, along with an AC-130 Spectre gunship, was stationed in Sigonella, Sicily—about an hour's flight from the Mission.  US aircraft at Aviano Air Base, in northeastern Italy, were about two hours away.  US F-16 Aircraft were located at Souda Bay, Greece.  Two Marine Corps Fleet Antiterrorism Security Teams were stationed three-and-a-half to four hours away, in Rota, Spain.  Also about three-and-a-half hours away, in Croatia, a forty-

man Special Operations Commander's-in-Extremis Force was conducting a counterterrorism exercise.   In the United States, Special Operations Forces were eight hours flying time from bases in Sicily and Spain, from where they could have inserted into Libya.  The Benghazi survivors were finally safe when they lifted off from Benghazi's airport, bound for Tripoli.  But thirteen hours after the siege began, no US assets were even airborne.

Shortly after the attacks, administration officials engaged in a cover-up of the facts surrounding the event, including deletion from the government databases relevant materials and reports, as set forth in a November 1, 2012 authoritative memorandum that has been submitted to several in Congress.

Contents

Paragraphs

Plaintiffs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2-12
Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13-16
Department of Defense
    FOIA Requests
        Initial reports. . . . . . . . . . . . . . . . . . . . . . . . . . . . 17-20
        Help from allies. . . . . . . . . . . . . . . . . . . . . . . . . . . 21
        Sigonella. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22-24
        Aviano. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25
        Rota. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
        Croatia. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
        United States. . . . . . . . . . . . . . . . . . . . . . . . . . . . .28
        Maps. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29
        Readiness status. . . . . . . . . . . . . . . . . . . . . . . . . . . 30
        Contingency plans. . . . . . . . . . . . . . . . . . . . . . . . . . . 31
        Terrorist threat. . . . . . . . . . . . . . . . . . . . . . . . . . . 32
        Aircraft radio transmission. . . . . . . . . . . . . . . . . . . 33
        October 2011 pre-positioned assets. . . . . . . . . . . . . 34
    Administrative Record
        Army. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35-39
        Navy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40-47
        Administrative appeals. . . . . . . . . . . . . . . . . . . . . . . 45
        Air Force. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48-54
        Marines. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55-61
        European Command. . . . . . . . . . . . . . . . . . . . . . . . . 62-68
        Central Command. . . . . . . . . . . . . . . . . . . . . . . . . . 69-73
        African Command. . . . . . . . . . . . . . . . . . . . . . . . . . 74-80
        Special Operations Command. . . . . . . . . . . . . . . . . . 81-85
        Office of Secretary of Defense and Joint Staff. . . . . . . 86-92
        Defense Intelligence Agency. . . . . . . . . . . . . . . . . . 93-103
State Department. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104-113

FBI. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114-123
CIA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124-131

## Jurisdiction

1.      Plaintiffs bring this action under the Freedom of Information Act ("the FOIA"), 5 U.S.C. § 552, as amended.  The FOIA provides this Court jurisdiction over this matter.  Venue is proper under § 552 (a)(4)(B) of the FOIA.

## Parties

2.      Plaintiff Accuracy in Media, Inc. ("AIM") is a District of Columbia non-profit 501(c)(3) corporation, organized and operated to publish and disseminate news to the American public, which it has steadily been doing done for over 35 years.  AIM's principle place of business is 4350 East West Highway, Suite 555, Bethesda, Maryland.

3.      Plaintiff Roger L. Aronoff is an individual residing at 5500 Friendship Boulevard, No. 1408, Chevy Chase, Maryland.  Mr. Aronoff serves as AIM's Editor and Executive Secretary.  He has worked as a journalist, TV producer, writer, and director of award-winning documentaries, and has appeared as a guest commentator on NPR, Air America, CNN, Fox News, CNBC, Court TV, Russia Today, and Canadian TV.  Mr. Aronoff is a prolific writer.  He has authored over a dozen articles on Benghazi.

4.      Mr. Aronoff is the founder of an informal association, the Citizens' Commission on Benghazi, or "CCB," a group of fifteen distinguished former military and Central Intelligence Agency personnel, all of whom are ardent students of the Benghazi tragedy, and all of whom are extremely troubled by it.  The CCB is

investigating the matter.  It functions like a grand jury, including issuing reports.

Collectively, CCB members have published over 40 articles on Benghazi.  *See, e.g.*,

http://www.aim.org/benghazi/.  Seven of the CCB's 15 members are plaintiffs in

this action.

        5.      Plaintiff Captain Larry W. Bailey, USN, (Ret.) is an individual residing

at 103 Pamlico Place, Chocowinity, North Carolina.  He is a 27-year US Navy SEAL

veteran.  In Vietnam, he led the first East Coast SEAL platoon into combat.  Captain

Bailey has also served in the Dominican Republic, Philippines, Panama, Bolivia, and

Scotland.  Captain Bailey commanded the Naval Special Warfare Center for three

years, where all SEALs are trained.  Since 2007, he has been involved in national

policy issues, including having chaired Gathering of Eagles.  He too is published on

the Benghazi matter.

        6.      Along with plaintiffs Lieutenant Colonel Benway and Colonel Brauer,

Captain Bailey is co-founder of *Special Operations Speaks*, or SOS, a pro-military PAC

focused primarily on the welfare of military personnel.  SOS views the Benghazi

tragedy as a symptom of a greater threat to United States power, and, so, regularly

includes Benghazi news among the matters it publicizes.  *See*

http://specialoperationsspeaks.com/.

        7.      Plaintiff Lieutenant Colonel Kenneth Benway, USA, (Ret.) is an

individual residing at 8 Martin Way, Whispering Pines, North Carolina.  Colonel

Benway enlisted in the Army as a parachute infantryman in 1966.  After Special

Forces training, he deployed to Vietnam.  In 1970, he was commissioned as Second

Lieutenant of Infantry, serving in leadership assignments in both Germany and

Italy.  Over the course of 27 years in uniform, Colonel Benway served with the three

Special Forces Groups, Special Operations Command in Europe, as an exchange

program officer with the Italian Susa Alpine Infantry Battalion in northwest Italy,

and with the Army JFK Special Warfare Center and School.  On retiring in 1993, he

served as senior special operations analyst, program manager and corporate

director in a variety of contracted support arrangements with the Army Special

Operations community.  Lieutenant Colonel Benway is co-founder of *Special*

*Operations Speaks.*

8.      Plaintiff Colonel Richard F. Brauer Jr., USAF, (Ret) is an individual

residing at 24 Country Club Road, Shalimar, Florida.  Colonel Brauer has amassed

5,200 hours of worldwide flying, attaining the aeronautical rating of Master

Navigator.  His tours of flying duty and deployments include Vietnam, Europe,

Central and South America, and Australia, where he served as an Air Force Exchange

Officer and flying instructor for the Royal Australian Air Force.  Following his

Pentagon tour, he was selected to be the 12th Commandant of the United States Air

Force Special Operations School, where he served until his retirement in 1991,

having completed 26 years of active duty military service.  In 2010, Colonel Brauer

was inducted into the Air Commando Hall of Fame.  He too is co-founder of *Special*

*Operations Speaks.*

9.      Plaintiff Clare M. Lopez is an individual who resides in Woodbridge,

Virginia.  She is Vice President for Research & Analysis at the Center for Security

Policy, 1901 Pennsylvania Avenue, NW, Suite 201, Washington, DC.  Ms. Lopez was

formerly was a career operations officer with the Central Intelligence Agency.  Ms.

Lopez is also a skilled writer, having authored numerous  articles on Benghazi, as well as being the principal author of the CCB's April 20, 2014 Interim Report on Benghazi.

10.     Plaintiff Admiral James A. Lyons, Jr., USN, (Ret) is an individual whose residence is 9481 Piney Mountain Road, Warrenton, Virginia.  Admiral Lyons is a former four-star admiral, Commander-in-Chief of the U.S. Pacific Fleet, Father of the Navy Seal Red Cell Program, Senior US Military Representative to the UN, and Deputy Chief of Naval Operations where he was the principal advisor to the Joint Chiefs of Staff.  His commands include the US Second Fleet, NATO Striking Fleet, Seventh Fleet Logistic Force, and several ship commands.  He has appeared on Fox Business News several times, and is a regular contributor to the Op Ed Section of the Washington Times, where eight of his pieces concerning Benghazi have been published.

11.     Plaintiff Kevin Michael Shipp is an individual residing at 636 9th Avenue North, Jacksonville Beach, Florida.  Mr. Shipp is a former Central Intelligence Agency officer and antiterrorism expert, having held several high level positions in the CIA.  He was assigned to be a protective agent for the Director of Central Intelligence, a counterintelligence investigator, a Counterterrorism Center officer, a team leader protecting sensitive CIA assets from assassination, a manager of high-risk protective operations, a lead instructor for members of allied governments, an internal staff security investigator, and a polygraph examiner.  He was tasked with protecting the CIA from foreign agent penetration and the chief of training for the CIA federal police force.  Mr. Shipp functioned as program manager for the

Department of State, Diplomatic Security, and Anti Terrorism Assistance global

police-training program.  He is the recipient of two CIA Meritorious Unit Citations,

three Exceptional Performance Awards, and a Medallion for overseas covert

operations.  He is the author of the book, *From the Company of Shadows–CIA*

*Operations and the War on Terrorism*, Ascent Pub., 2012.

12.    These seven members of the Citizens Committee on Benghazi, along

with Accuracy in Media, Inc., are collectively referred to as "plaintiffs."

### **Defendants**

13.    Defendant United States Department of Defense, or "DOD" or

"defendant" is a Department of the Executive Branch of the United States, and is an

agency within the meaning of 5 U.S.C. § 552 (f)(1).  Plaintiffs made FOIA requests to

the following component offices of the Department of Defense:

   (1)    Department of the Army, or "Army"
   (2)    Navy Department, or "Navy"
   (3)    Department of the Air Force, or "Air Force"
   (4)    Marine Corps
   (5)    European Command
   (6)    Central Command
   (7)    Africa Command
   (8)    Special Operations Command
   (9)    Office of Secretary of Defense and Joint Staff
   (10)   Defense Intelligence Agency

14.    Defendant United States Department of State ("State Department") is

a Department of the Executive Branch of the United States, and is an agency within

the meaning of 5 U.S.C. § 552 (f)(1).

15.    Defendant United States Department of Justice is a Department of the

Executive Branch of the United States, and is an agency within the meaning of 5

U.S.C. § 552 (f)(1).  The Federal Bureau of Investigation is the investigative

component of the Department of Justice.  The Department of Justice is responsible

for the FBI's compliance with the FOIA.  This defendant is hereinafter referred to as

simply "FBI."

16.     Defendant Central Intelligence Agency ("CIA") is a Department of the

Executive Branch of the United States, and is an agency within the meaning of 5

U.S.C. § 552 (f)(1).

### DEPARTMENT OF DEFENSE

### FOIA REQUESTS

17.     Plaintiffs made 17 FOIA requests to the DOD.

**Initial reports**

18.     Copies of <u>radio communications from the compound</u>, requested from

Africa Command [and State Department]:

> Audio.  All records of **radio communications** emanating from
> the **Compound's Tactical Operations Center** (TOC), on
> September 11th and 12th, 2012, whether made by Regional
> Security Officer (RSO) Alec Henderson or any other person.

19.     Records of <u>contemporaneous notifications to DOD</u>, sought from

Defense Intelligence Agency:

> **Op Rep 3's**. The OPEREP-3 PINNACLE **reports used** to
> provide any Department of Defense division (or office or
> entity) with notification of, or **information about**, the
> September 11th and 12th, 2012 **attacks** on U.S. facilities in
> Benghazi, Libya

20.     <u>Communications to and from AFRICOM</u> Joint Operations Center, made

to Africa Command:

AFRICOM communications.  All records of **AFRICOM Joint Operations Center** (JOC) Chief's communications subsequent to that Officer's receipt of messages emanating from the Compound's TOC.  This request is to be read to include all communications **to all US personnel, whether armed forces or civilians**, and includes communications to General Carter Ham, the Unified Combatant Command, the Pentagon, CIA, Department of State, and White House including the Situation Room.

### Help from allies

21.     Appeals for <u>help from allies in country</u> made to (1) Africa Command,

and (2) Office of the Secretary of Defense and the Joint Staff [and State Department]:

> **Appeals for help**.  Records of **requests for help** for personnel at the Special Mission Compound and the CIA Annex, to:
> (a)     The **Turkish Consulate** in Benghazi;
> (b)     The **Italian Consulate** in Benghazi; and
> (c)     The **U.K. Security Team**.

### Sigonella

22.     Request for records of <u>130-man Marine Force team at Naval Air</u>

<u>Station Sigonella, Sicily</u> made to (1) Navy, (2) Air Force, (3) Marines, and (4)

European Command:

> Records disclosing the readiness status of the **130-man Marine Force Reconnaissance Team** at NAS Sigonella, including:
>
> (a)     All communications with, and orders to, NAS Sigonella personnel to get ready to deploy, and, if applicable, to deploy, to Benghazi; and
> (b)     All communications from NAS Sigonella personnel notifying command that assets were ready to deploy, and, if applicable, that aircraft was airborne, bound for Benghazi, and, if applicable, orders to abort or turn back.

23.     Records of <u>US aircraft in Sigonella, Sicily</u> made to (1) Navy, (2) Air

Force, and (3) European Command:

> **Sigonella**.  Records identifying, and concerning, all **US aircraft** at NATO Base Sigonella, Naval Air Station Sigonella in Sicily, Italy ("NAS Sigonella"), whether transport, cargo, refueling, fighter, attack, or surveillance.  Records should include those that disclose the readiness status of:
> - Any  F-16 and F-18 fighters (a/k/a F/A-18 – Fighter/Attack);
> - C-5, C-9, C-17, C-40 and C-130 transport;
> - C-2 cargo; C-26 passenger/cargo;
> - KC-10 and KC-135 refueling; and
> - P-3 surveillance.

24.     Request for records of DOD seeking <u>help by use of Italian aircraft in</u>

<u>Sigonella Sicily</u> made to (1) Marines, and (2) European Command:

> Any records of the Department of Defense **seeking help by use of Italian aircraft** at NAS Sigonella.

**<u>Aviano</u>**

25.     Request for records of <u>US aircraft at Aviano, Italy</u>, made to Air Force:

> [D]isclosure of records identifying all **US aircraft at Aviano** Air Base in northeastern Italy on September 11th and 12th, 2012, including all U.S. Air Force 31st Fighter Wing assets, whether transport, cargo, refueling, fighter, attack, or surveillance.

**<u>Rota</u>**

26.     Request for records of two <u>Marine Corps Fleet Antiterrorism Security</u>

<u>Teams in Rota, Spain</u> made to (1) Navy, (2) Marines, (3) European Command, and

(4) Special Operations Command:

**Rota**.  Records revealing the status of **two Marine Corps "Fleet Antiterrorism Security Teams** ("FAST"), at the Spanish naval base Naval Station Rota ("NAVSTA Rota"), including:

(a)     All communications with, and orders to, NAVSTA Rota personnel to get ready to deploy, and, if applicable, to deploy; and

(b)     All communications from NAVSTA Rota personnel notifying command that assets were ready to deploy, and, if applicable, that aircraft was airborne, bound for Benghazi, and, if applicable, orders to abort or turn back

## Croatia

27.     Records of <u>orders to Special Operations Commanders-In-Extremis Force in Croatia</u> made to (1) Army, (2) European Command, and (3) Special Operations Command:

Records regarding the readiness status of, and **orders** given to, **airborne special operations unit, "Commanders-In-extremis Force**" ("CIF"), assigned to the European Command, and **in Croatia**, including:

(a)     Orders for the CIF to deploy to NAS Sigonella; and

(b)     All communications from the CIF notifying command that it was ready to deploy, and, if applicable, that aircraft was airborne, bound for NAS Sigonella, and, if applicable, orders to abort or turn back.

## United States

28.     <u>Orders to Special Operations in the United States</u> made to Special Operations Command:

**United States**.  Records disclosing the readiness status of, and orders given to,  **Special Operations Forces** ("Special Ops" or "SOF") **in the United States**, including:

(a)     **Orders** for Special Ops to deploy to Libya; and

(b)     **Communications** from SOF notifying command that it was ready to deploy, and, if applicable, that aircraft was airborne, bound for Libya, and, if applicable, orders to abort or turn back.

### Maps

29.     Request for <u>maps depicting assets</u> made to (1) European Command,

(2) Africa Command, (3) Central Command, (4) Office of the Secretary of Defense

and Joint Staff, and (5) Defense Intelligence Agency:

> Maps. **Maps depicting all assets** that could have been
> dispatched to the Benghazi mission or the CIA annex facility on
> September 11th and 12th, 2012, regardless of such maps were
> created before or after September 11, 2012.

### Readiness status

30.     Records of <u>readiness status of all armed forces</u> requested from

Defense Intelligence Agency:

> **Orders regarding readiness status**.  For the period of July 1,
> 2012, through September 30, 2012, records of all **directives,
> orders and other communications regarding the readiness
> status** of United States armed forces on the anniversary of the
> September 11th,  2001, attacks on the World Trade center, to
> or from:
>
>> EUCOM (European Command);
>> CENTCOM (United States Central Command);
>> AFRICOM (U.S. Africa Command);
>> USSOCOM (Special Operations Command);
>> OSD/JS (Office of Secretary of Defense and Joint Staff);
>> Naval Air Station Sigonella, Sicily;
>> Spanish naval base Naval Station Rota, Spain;
>> Aviano Air Base in northeastern Italy; and
>> Special Operations Forces in the United States

### Contingency plans

31.     Records of relevant military <u>contingency action plans</u> made to Office

of Secretary of Defense and Joint Staff:

Records concerning **joint military contingency plans**:

(a) **Plan Identification (PID) Number and title of the operation plan or plans** prepared using Deliberate Planning procedures, found in Joint Publication 5-0, Joint Operation Plan, August 2011, for use by the supported combatant commander (1) to support military, diplomatic and interagency activities in Libya**,** through 2012, and (2) to support the military crisis response to the attacks on the Benghazi facilities on September 11 and 12, 2012.

(b) **Operation plan or plans** for use by the supported combatant commander to support military crisis response to the attacks on the Benghazi facilities on September 11 and 12, 2012.

(c) List of commands, organizations and agencies comprising the **joint planning and execution community** (JPEC), found in Joint Publication 5-0, Joint Operation Plan, August 2011, which developed, coordinated, and approved the operation plans referred to under (a) above.

(d) Supported **combatant commander's Joint Intelligence Preparation** of the Operational Environment (JIPOE), developed to support the plans referenced under (a) above.

(e) List of commands, organizations, agencies and offices comprising the **supported combatant commander's joint interagency coordinating group** (JIACG), established to support the plans referenced under (a) above.

(f) Copies of any c**ombatant command commercial contracts established to support military, diplomatic and interagency activities at Tripoli and at Benghazi** prior to the attacks on the Benghazi facilities on September 11 and 12,  2012.

### Terrorist threat

32.   Reports of <u>terrorist threat in 2012</u> made to Defense Intelligence

Agency:

**Terrorist threat in 2012**.  For the calendar year 2012, **records of the threat** to U.S. personnel because of al-Qaida or Ansar al-Shariah or other belligerent build-up in Benghazi, including photographs.

### Aircraft radio transmission

33.     Request for "<u>Feet dry over Libya" radio transmission</u> made to (1) Air

force, (2) Africa Command, and (3) Special Operations Command:

> **"Feet dry over Libya" radio transmission.**  Any record of
> transmission from any aircraft during the crisis that stated,
> "Feet dry over Libya," or words to that effect, informing that
> aircraft was transitioning from above the Mediterranean Sea to
> above the Libyan landmass.

### October 2011 assets pre-positioned

34.     Records of <u>assets pre-positioned off the coast of Tripoli on October 18,</u>

<u>2011</u>, made to (1) Navy, (2) Africa Command, (3) Office of the Secretary of Defense

and the Joint Staff, and (4) Defense Intelligence Agency [as well as State

Department]:

> **Military assets pre-positioned in October 2011**.  In addition
> to records regarding the attack on US facilities in Benghazi,
> Libya, on September 11th and 12th, we also seek records
> identifying DoD assets pre-positioned off the coast of Tripoli on
> October 18, 2011, when Secretary Clinton visited Libya.

### ADMINISTRATIVE RECORD

### Army
### March 31, 2014 FOIA Request

35.     On March 31, 2014, plaintiffs submitted their FOIA request, by

certified mail, to the Army.  Plaintiffs requested "disclosure of records regarding the

attack on US facilities in Benghazi, Libya, on September 11th and 12th, 2012."

Specifically, plaintiffs sought production of:

> Records regarding the readiness status of, and **orders** given to,
> **airborne special operations unit, "Commanders-In-extremis
> Force"** ("CIF"), assigned to the European Command, and **in Croatia**,
> including:

(a)   Orders for the CIF to deploy to NAS Sigonella; and

(b)   All communications from the CIF notifying command that it was ready to deploy, and, if applicable, that aircraft was airborne, bound for NAS Sigonella, and, if applicable, orders to abort or turn back.

36.    Seeking a waiver of any fees associated with the search and review of responsive records, the FOIA request sought agency recognition as "representatives of the news media."  Plaintiffs' are entitled to news media status because disclosure is in the public interest:  It will be "likely to contribute significantly the public understanding of the activities or operations of the government and is not primarily in the commercial interest of the requester." 5 U.S.C. § 552 (a)(4)(A)(ii)(II). Plaintiffs also sought a public interest waiver of duplication fees, under 5 U.S.C. § 552(a)(4)(A)(iii).

37.    Plaintiffs FOIA request also prays for expedited processing under U.S.C. § 552 (a)(4)(A)(ii)(II), citing DOD Regulation 5400.7-R, "Department of Defense Freedom of Information Act Program."  Plaintiffs posit that the regulations support expedition because "the information is urgently needed by an individual primarily engaged in disseminating information in order to inform the public concerning actual or alleged Federal Government activity," and that the requesters have demonstrated a "compelling need for the information."

38.    By letter dated June 19, the Army wrote that it had "responded to your request on April 03, 2014, informing you that we referred the request to the Department of State.  On June 19, 2014, we received a letter from the Department of State informing us that you will have to send your request directly to them."  On June 20, plaintiffs replied:

There appears to be a misunderstanding.  Contrary to your June 19 letter, the Army did not notified (sic) me of any referral.  This is the first I have heard from the Army since I submitted the Request on March 31.  Kindly email me a copy of the referenced notification.  Moreover, it would appear to be an error to refer the request to the State Department....  In an effort to alleviate the necessity of the Army to refer the matter, I made the same FOIA request to two other DoD components, and so informed the Army, writing, "[k]indly note that we are simultaneously making this request, verbatim, to (1) HQ USEUCOM (U.S. European Command), and (2) HQ USSOCOM (Special Operations Command)."  Even if the orders to deploy, or not deploy, assets, had come from the State Department, we still seek the DoD records.  These same requesters already submitted extensive FOIA requests to the State Department, first on February 21, 2014, and second on April 7, 2014.

### Constructive Exhaustion
### of Administrative Remedies

39.      Beyond its June 19 notification that it had referred plaintiffs' FOIA request to the State Department, the Army has not responded.  As of the date of this complaint, defendant has failed to produce any responsive records or to demonstrate that they are exempt from disclosure.  Because the twentieth day since plaintiffs made their March 31 FOIA request was in April, plaintiffs have constructively exhausted their administrative remedies under 5 U.S.C. § 552 (b)(6)(A)(i).

### Navy
### March 31, 2014 FOIA Request

40.      On March 31, 2014, plaintiffs wrote to the Secretary of the Navy Chief of Naval Operations FOIA Office, seeking "disclosure of records regarding the attack on US facilities in Benghazi, Libya, on September 11th and 12th, 2012."  Plaintiffs sought discloser of:

1.   **Sigonella**.  Records identifying, and concerning, all **US aircraft** at NATO Base Sigonella, Naval Air Station Sigonella in Sicily, Italy ("NAS Sigonella"), whether transport, cargo, refueling, fighter, attack, or surveillance.  Records should include those that disclose the readiness status of:
   - Any  F-16 and F-18 fighters (a/k/a F/A-18 – Fighter/Attack);
   - C-5, C-9, C-17, C-40 and C-130 transport;
   - C-2 cargo; C-26 passenger/cargo;
   - KC-10 and KC-135 refueling; and
   - P-3 surveillance.

2.   Records disclosing the readiness status of the **130-man Marine Force Reconnaissance Team** at NAS Sigonella, including:
   (a)   All communications with, and orders to, NAS Sigonella personnel to get ready to deploy, and, if applicable, to deploy, to Benghazi; and
   (b)   All communications from NAS Sigonella personnel notifying command that assets were ready to deploy, and, if applicable, that aircraft was airborne, bound for Benghazi, and, if applicable, orders to abort or turn back.

3.   **Rota**.  Records revealing the status of **two Marine Corps "Fleet Antiterrorism Security Teams"** ("FAST"), at the Spanish naval base Naval Station Rota ("NAVSTA Rota"), including:
   (a)   All communications with, and orders to, NAVSTA Rota personnel to get ready to deploy, and, if applicable, to deploy; and
   (b)   All communications from NAVSTA Rota personnel notifying command that assets were ready to deploy, and, if applicable, that aircraft was airborne, bound for Benghazi, and, if applicable, orders to abort or turn back.

4.   **Military assets pre-positioned in October 2011**.  In addition to records regarding the attack on US facilities in Benghazi, Libya, on September 11th and 12th, we also seek records identifying DoD assets pre-positioned off the coast of Tripoli on October 18, 2011, when Secretary Clinton visited Libya.

41.    Plaintiffs' FOIA request prayed for:

(a)    Recognition as a member of the news media fee waivers under 5 U.S.C. § 552 (a)(4)(A)(ii)(II);

(b)    A public interest waiver of duplication fees under 5 U.S.C. § 552(a)(4)(A)(iii); and

(c)    Expedited processing under U.S.C. § 552 (a)(4)(A)(ii)(II).

42.    In an effort to avoid the necessity of Navy having to refer the requests

to other components of defendant DOD, plaintiffs wrote:

> Kindly note that <u>Request No. 1</u>, seeking disclosure of records of aircraft at Sigonella, is also being made to (a) the Department of the Air Force, and (b) the HQ USEUCOM (U.S. European Command).  <u>Request No. 2</u>, for records concerning the readiness status of the 130-man Marine Force, is also being made to (a) the Department of the Air Force, (b) HQ USEUCOM (U.S. European Command), and (c) Commandant of the Marine Corps.  <u>Request No. 4</u>, for records of military assets pre-positioned in October 2011 off the coast of Tripoli, is also made to (a) HQ U.S. AFRICOM (U.S. Africa Command), as well as (b) OSD/JS (Office of the Secretary of Defense and the Joint Staff).

43.    By April 16 email, the Navy acknowledged receipt of plaintiffs' FOIA

request.  A week later, on April 23, 2014, the Navy wrote:

> We have determined that the information you are seeking may be maintained by the Commander, Naval Forces Europe and Africa/US Sixth Fleet...  Therefore, we have forwarded your request to that office for action and direct response to you. Please be advised... will address your request for an expedited processing and fee waiver.

44.    By letter dated May 7, 2014, the office of the Commander, Naval

Forces Europe and Africa/US Sixth Fleet, denied plaintiffs' request for expedited

processing, as well as plaintiffs' request for statutory fee waivers.

45.    On June 16, 2014, plaintiffs administratively appealed.  Plaintiffs

administratively appealed all DOD denials of expedited processing and statutory fee

waiver determinations in the 40-page appeal, plus 38 attached exhibits.  Plaintiffs'

appeal proves:

- For the first ten days following the attacks, the Administration repeatedly represented that the attack was spontaneous.  This was false, and known to be false.  Since then, the Administration has advanced several different versions of the facts.

- The Administration baldly claims that it reacted with all due dispatch, even while the publicly-available record would appear to contradict that claim, in several respects.  Disclosure of the just the DOD records sought will settle the matter.

- Moreover, even if any one of the Administration's narratives were true, it would not solve the mystery of why the government failed to try to rescue its personnel.  Congressional probes and reports demonstrate the Administration's negligence, but are silent on the issue of motive for the absence of an immediate response by the DOD.

- The Administration facilitated delivery of weapons to militias known to be affiliates of jihadists, first to bring down Qaddafi, and subsequently to try and oust Assad.  Did decision-makers fear that a rescue operation might expose this operation, exposing them to accusations of violating The Arms Export Control Act, or even materially supporting terrorists?

- The circumstances mandate expedited processing.  If processed in the regular course, full disclosure will occur only after the November 2016 elections, and the American people would lose the opportunity to meaningfully participate in this debate.  The particular value of the information would be lost.  This is particularly evident given the high probability that litigation at the appellate level will be necessary.

- On the issue of when and how the State Department responded, disclosure will also reveal whether Secretary Clinton was truthful when she claimed to have sought help from American allies.

- "Here, the public interest in disclosure is enormous... The public has a right to disclosure of records that would answer the many questions posed by the facts of the Benghazi attacks—*before* the next presidential election."

46.     By June 30 letter, the Navy acknowledged that it had received plaintiffs' appeal on June 18.  On June 20, the Navy wrote to plaintiffs that they were "unable to complete your appeal within the statutory time requirement."

Exhaustion of
Administrative Remedies

47.     By letter of August 20, 2014, the Navy ruled on plaintiffs' appeal, granting it in part, and denying in part.  The Navy agreed to treat plaintiffs as a "member of the news media," and agreed to grant them a public interest waiver of duplication fees, but denied plaintiffs' request for expedited processing.  Plaintiffs have exhausted their administrative remedies.

> (a)     Recognition as a member of the news media fee waivers under 5 U.S.C. § 552 (a)(4)(A)(ii)(II);
>
> (b)     A public interest waiver of duplication fees under 5 U.S.C. § 552(a)(4)(A)(iii); and

**Air Force**
**First FOIA Request—March 31, 2014**

48.     On March 31, 2014, by certified mail to the Air Force, plaintiffs requested "disclosure of records regarding the attack on US facilities in Benghazi, Libya, on September 11th and 12th, 2012."  Specifically, plaintiffs sought production of:

> 1.     **Sigonella**.  Records identifying, and concerning, all **US aircraft** at NATO Base Sigonella, Naval **Air Station Sigonella in Sicily**, Italy ("NAS Sigonella"), whether transport, cargo, refueling, fighter, attack, or surveillance.  Records should include those that disclose the readiness status of:
>     - Any  F-16 and F-18 fighters (a/k/a F/A-18 – Fighter/Attack);
>     - C-5, C-9, C-17, C-40 and C-130 transport;
>     - C-2 cargo; C-26 passenger/cargo;

- KC-10 and KC-135 refueling; and
- P-3 surveillance.

2.  Records disclosing the readiness status of the **130-man Marine Force Reconnaissance Team at NAS Sigonella**, including:

    (a)  All communications with, and **orders** to, NAS Sigonella personnel to get ready to deploy, and, if applicable, to deploy; and

    (b)  All **communications** from NAS Sigonella personnel notifying command that assets were ready to deploy, and, if applicable, that aircraft was airborne, bound for Benghazi, and, if applicable, orders to abort or turn back.

3.  **"Feet dry over Libya" radio transmission.**  Any record of transmission from any aircraft during the crisis that stated, "Feet dry over Libya," or words to that effect, informing that aircraft was transitioning from above the Mediterranean Sea to above the Libyan landmass.

49.  Plaintiffs' FOIA request prayed for:

    (a)  Recognition as a member of the news media fee waivers under 5 U.S.C. § 552 (a)(4)(A)(ii)(II);

    (b)  A public interest waiver of duplication fees under 5 U.S.C. § 552(a)(4)(A)(iii); and

    (c)  Expedited processing under U.S.C. § 552 (a)(4)(A)(ii)(II).

50.  In an effort to avoid the necessity of Department of the Air Force to refer the requests to other components of defendant DOD, plaintiffs wrote:

> Kindly note that Request No. 1, seeking disclosure of records of aircraft at Sigonella, is also being made to (a) Secretary of the Navy Chief of Naval Operations (SECNAV/CNO), as well as (b) the HQ USEUCOM (U.S. European Command). Request No. 2, for records concerning the readiness status of the 130-man Marine Force at Sigonella, is also being made to (a) the Commandant of the Marine Corps, (b) the Secretary of the Navy Chief of Naval Operations (SECNAV/CNO), and (c) HQ USEUCOM (U.S. European Command). Request No. 3, for records of a radio transmission, "Feet dry over Libya" or the like, is also being made to (a) HQ U.S. AFRICOM (U.S. Africa

Command), and (b) HQ USSOCOM (Special Operations Command).

51.    The Air Force has failed to respond.

Constructive Exhaustion
of Administrative Remedies

52.    The twenty day period since plaintiffs March 31 was submitted expired in April, and the Air Force has yet to disclose any records, or even respond. Thus, plaintiffs have constructively exhausted their administrative remedies by virtue of the Air Force's failure to respond within twenty working days under 5 U.S.C. § 552 (b)(6)(A)(i).

**Air Force**
**Second FOIA Request—April 7, 2014**

53.    On April 7, 2014, by certified mail to defendant Department of the Air Force, plaintiffs sought:

> [D]isclosure of records identifying all US aircraft at Aviano Air Base in northeastern Italy on September 11th and 12th, 2012, including all U.S. Air Force 31st Fighter Wing assets, whether transport, cargo, refueling, fighter, attack, or surveillance.

54.    Here too plaintiffs' FOIA request sought:

(a)    Recognition as a member of the news media fee waivers under 5 U.S.C. § 552 (a)(4)(A)(ii)(II);

(b)    A public interest waiver of duplication fees under 5 U.S.C. § 552(a)(4)(A)(iii); and

(c)    Expedited processing under U.S.C. § 552 (a)(4)(A)(ii)(II).

Constructive Exhaustion
of Administrative Remedies

55.     The twenty day period since plaintiffs submitted this FOIA request

expired in May, without a response from the Air Force, and plaintiffs have

constructively exhausted their administrative under 5 U.S.C. § 552 (b)(6)(A)(i).

**Marine Corps**
**March 31, 2014 FOIA Request**

56.     On March 31, 2014, plaintiffs sent, via certified mail return receipt

requested, to Commandant of the Marine Corps, a FOIA request for "disclosure of

records regarding the attack on US facilities in Benghazi, Libya, on September 11th

and 12th, 2012."  Specifically, plaintiffs sought disclosure of:

1.  **Sigonella**.  Records disclosing the readiness status of the
    **130-man Marine Force Reconnaissance Team** at NAS
    Sigonella, including:
    (a)     All **communications** with, and **orders** to, NAS
            Sigonella personnel to get ready to deploy, and, if
            applicable, to deploy, to Benghazi; and
    (b)     All communications from NAS Sigonella personnel
            notifying command that assets were ready to deploy,
            and, if applicable, that aircraft was airborne, bound for
            Benghazi, and, if applicable, orders to abort or turn
            back.
2.  Any records of the Department of Defense **seeking help by
    use of Italian aircraft** at NAS Sigonella.
3.  **Rota**.  Records revealing the **status of two Marine Corps
    "Fleet Antiterrorism Security Teams** ("FAST"), at the
    Spanish naval base Naval Station Rota ("NAVSTA Rota"),
    including:
    (a)     All **communications** with, and **orders** to, NAVSTA
            Rota personnel to get ready to deploy, and, if applicable,
            to deploy; and
    (b)     All communications from NAVSTA Rota personnel
            notifying command that assets were ready to deploy,
            and, if applicable, that aircraft was airborne, and, if
            applicable, orders to abort or turn back.

57.     Here too plaintiffs' FOIA request included prayers for:

     (a)     Recognition as a member of the news media fee waivers under 5 U.S.C. § 552 (a)(4)(A)(ii)(II);

     (b)     A public interest waiver of duplication fees under 5 U.S.C. § 552(a)(4)(A)(iii); and

     (c)     Expedited processing under U.S.C. § 552 (a)(4)(A)(ii)(II).

58.     In an effort to avoid the necessity of Marine Corps having to refer the requests to other components of defendant DOD, plaintiffs wrote:

> Kindly note that <u>Request No. 1</u>, for records concerning the readiness status of the 130-man Marine Force at Sigonella, is also being made to (a) the Secretary of the Navy Chief of Naval Operations (SECNAV/CNO),  (b) the Department of the Air Force, and (c) HQ USEUCOM (U.S. European Command). <u>Request No, 2</u>, for any records of the Department of Defense seeking help by use of Italian aircraft at NAS Sigonella, is also being made to HQ USEUCOM (U.S. European Command). <u>Request No. 3</u>, for records of the status of the two Marine Corps "FAST" teams at Spanish naval base Naval Station Rota, is also being made to (a) Secretary of the Navy Chief of Naval Operations (SECNAV/CNO), (b) HQ USEUCOM (U.S. European Command), and (c) HQ USSOCOM (Special Operations Command).

59.     By email dated April 8, 2014, the Marine Corps acknowledged receipt of plaintiffs' FOIA request.  Two weeks later, on April 23, 2014, the Marine Corps wrote:

> In an effort to assist you we have referred **item one** of your request to the Commander, US Marine Forces Europe, Attn: G-1 FOIA, Unit 30401, APO-AE9107, for direct response to you.  If you would like to inquire about the status of your request, please contact Major Roger Mattioli via email at <u>roger.mattioli@usmc</u> or by fax to 011-49-703-112-392.

> We note that **item two** refers to records under the cognizance of the Department of Defense (DoD).  Since you also sent your request to DoD, we will not refer this to them and will consider that as inapplicable to the U.S. Marine Corps.

> Per our previous correspondence, we have referred **item three** of your request to the Marine Corps Security Force Regiment, 4th St. Bldg 624, Williamsburg, VA 23185, for direct response to you.  If you would like to inquire about the status of your request, please call Captain Siva Ambikapath at (757) 877-7126 or send an email to siva.ambikapath@usmc.mil.

60.     Contrary to Marine Corps' assertion that it had, "[p]er our previous correspondence... referred item three of your request to the Marine Corps Security Force Regiment... for direct response," plaintiffs have received no such correspondence.

Constructive Exhaustion
<u>of Administrative Remedies</u>

61.     Beyond its April 8 letter informing plaintiffs that it had referred the request to other Marine Corps offices, defendant has not responded.  As of the date of this Complaint, it has failed to produce any responsive records, or demonstrate that such records are exempt from production.  Because the twentieth day since plaintiffs made their March 31 FOIA request was in April, plaintiffs have constructively exhausted their administrative remedies under 5 U.S.C. § 552 (b)(6)(A)(i).

**European Command**
**<u>March 31, 2014 FOIA Request</u>**

62.     On March 31, 2014, by certified mail to defendant European Command, plaintiffs requested "disclosure of records regarding the attack on US facilities in Benghazi, Libya, on September 11th and 12th, 2012."  Specifically, plaintiffs sought disclosure of:

> 1.     **Sigonella**.  Records identifying, and concerning, all **US aircraft** at NATO Base Sigonella, Naval Air Station **Sigonella in Sicily**, Italy ("NAS Sigonella"), whether transport, cargo, refueling,

28

fighter, attack, or surveillance.  Records should include those that disclose the readiness status of:
- Any  F-16 and F-18 fighters (a/k/a F/A-18 – Fighter/Attack);
- C-5, C-9, C-17, C-40 and C-130 transport;
- C-2 cargo; C-26 passenger/cargo;
- KC-10 and KC-135 refueling; and
- P-3 surveillance.

2.  Records disclosing the readiness status of the **130-man Marine Force Reconnaissance Team** at NAS Sigonella, including:

   (a)  All **communications** with, and **orders** to, NAS Sigonella personnel to get ready to deploy, and, if applicable, to deploy, to Benghazi; and

   (b)  All communications from NAS Sigonella personnel notifying command that assets were ready to deploy, and, if applicable, that aircraft was airborne, bound for Benghazi, and, if applicable, orders to abort or turn back.

3.  Any records of the Department of Defense seeking **help by use of Italian aircraft** at NAS Sigonella.

4.  **Rota**.  Records revealing the status of **two Marine Corps Fleet Antiterrorism Security Teams ("FAST"), at the Spanish naval base Naval Station Rota** ("NAVSTA Rota"), including:

   (a)  All **communications with, and orders to**, NAVSTA Rota personnel to get ready to deploy, and, if applicable, to deploy; and

   (b)  All communications from NAVSTA Rota personnel notifying command that assets were ready to deploy, and, if applicable, that aircraft was airborne, and, if applicable, orders to abort or turn back.

5.  **Croatia.**  Records regarding the readiness status of, and orders given to, airborne special operations unit, **"Commanders In-extremis Force" ("CIF")**, assigned to the European Command, and **in Croatia**, including:

   (a)  **Orders** for the CIF to deploy to NAS Sigonella; and

   (b)  All **communication**s from the CIF notifying command that it was ready to deploy, and, if applicable, that aircraft was airborne, bound for NAS Sigonella, and, if applicable, orders to abort or turn back.

6. **Maps.** Maps **depicting all assets** that could have been dispatched to the Benghazi mission or the CIA annex facility on September 11th and 12th, 2012, regardless of such maps were created before or after September 11, 2012.

63. In an effort to avoid the necessity of European Command to refer the requests to other components of defendant DOD, plaintiffs' FOIA request states:

> Kindly note that <u>Request No. 1</u>, seeking disclosure of records of aircraft at Sigonella, is also being made to (a) the Secretary of the Navy Chief of Naval Operations (SECNAV/CNO), and (b) the Department of the Air Force. <u>Request No. 2</u>, for records concerning the readiness status of the 130-man Marine Force at Sigonella, is also being made to (a) the Secretary of the Navy Chief of Naval Operations (SECNAV/CNO), (b) the Department of the Air Force, and (c) Commandant of the Marine Corps. <u>Request No. 3</u>, for any records of the Department of Defense seeking help by use of Italian aircraft at NAS Sigonella, is also being made to the Commandant of the Marine Corps. <u>Request No. 4</u>, for records of the status of the two Marine Corps "FAST" teams at Spanish naval base Naval Station Rota, is also being made to (a) the Commandant of the Marine Corps, and (b) HQ USSOCOM (Special Operations Command).

64. Again, plaintiffs' FOIA request sought:

(a) Recognition as a member of the news media fee waivers under 5 U.S.C. § 552 (a)(4)(A)(ii)(II);

(b) A public interest waiver of duplication fees under 5 U.S.C. § 552(a)(4)(A)(iii); and

(c) Expedited processing under U.S.C. § 552 (a)(4)(A)(ii)(II).

65. By letter dated May 22, 2014, European Command denied plaintiffs' request for expedited processing, as well as their request to be placed in the "news media" fee category.

66. On June 30, 2014, plaintiffs administratively appealed. The particulars of that appeal, as well as all DOD appeals, are set forth above.

67.     By letter dated July 3, 2014, European Command notified plaintiffs

that it was "unable to complete your appeal within the [twenty working-day]

statutory time requirement."

Constructive Exhaustion<br>of Administrative Remedies

68.     European Command received plaintiffs' administrative appeal on June

18.  It has not to date decided plaintiffs' appeal.  Taking into account the ten working

day extension as memorialized by defendant in its July 3 letter, the time for the Navy

to rule on plaintiff's appeal has run, under 5 U.S.C. § 552 (b)(6)(A)(i).  Thus,

plaintiffs have exhausted their administrative remedies.

**Central Command**<br>**March 31, 2014 FOIA Request**

69.     On March 31, 2014, by certified mail to defendant Central Command,

plaintiffs requested "disclosure of records regarding the attack on US facilities in

Benghazi, Libya, on September 11th and 12th, 2012."  Specifically, plaintiffs sought

production of:

> Maps depicting all assets that could have been dispatched to
> the Benghazi mission or the CIA annex facility on September
> 11th and 12th, 2012, regardless of such maps were created
> before or after September 11, 2012.

70.     In an effort to avoid the necessity of Central Command to refer the

requests to other components of defendant Department of Defense, plaintiffs wrote,

"[k]indly note that this Request is simultaneously being made to (a) HQ USEUCOM

(U.S. European Command), (b) HQ U.S. AFRICOM (U.S. Africa Command), and (c)

OSD/JS (Office of the Secretary of Defense and the Joint Staff).

71.     Plaintiffs' FOIA request sought (a) news media fee waivers under 5

U.S.C. § 552 (a)(4)(A)(ii)(II), (b) a public interest waiver of duplication fees under 5

U.S.C. § 552(a)(4)(A)(iii), and (c) expedited processing under U.S.C. § 552

(a)(4)(A)(ii)(II).

72.     Defendant Central Command has failed to respond to plaintiffs'

requests.

Constructive Exhaustion
of Administrative Remedies

73.     The twenty day period since plaintiff's ' March 31 FOIA request was in

April.  Central Command has not responded.  Plaintiffs have constructively

exhausted their administrative remedies by virtue of the DOD's failure to respond

within twenty working days under 5 U.S.C. § 552 (b)(6)(A)(i).

**Africa Command**
**March 31, 2014 FOIA Request**

74.     On March 31, 2014, by certified mail to defendant Africa Command,

plaintiffs requested "disclosure of records regarding the attack on US facilities in

Benghazi, Libya, on September 11th and 12th, 2012."  Plaintiffs sought disclosure of:

1.  **AFRICOM communications.**  All records of **AFRICOM Joint Operations Center** (JOC) Chief's communications subsequent to that Officer's receipt of messages emanating from the Compound's TOC.  This request is to be read to include all communications **to all US personnel, whether armed forces or civilians**, and includes communications to General Carter Ham, the Unified Combatant Command, the Pentagon, CIA, Department of State, and White House including the Situation Room.

2.  **Appeals for help**.  Records of **requests for help** for personnel at the Special Mission Compound and the CIA Annex, to:

    (a)    The **Turkish Consulate** in Benghazi;
    (b)    The **Italian Consulate** in Benghazi; and
    (c)    The **U.K. Security Team**.

3.    **Maps.**  Maps **depicting all assets** that could have been dispatched to Benghazi mission or the CIA annex facility on September 11th and 12th, 2012, regardless of such maps were created before or after September 11, 2012.

4.    **Audio**.  All records of **radio communications** emanating from the **Compound's Tactical Operations Center** (TOC), on September 11th and 12th, 2012, whether made by Regional Security Officer (RSO) Alec Henderson or any other person.

5.    **"Feet dry over Libya" radio transmission.**  Any record of transmission from any aircraft during the crisis that stated, "Feet dry over Libya," or words to that effect, informing that aircraft was transitioning from above the Mediterranean Sea to above the Libyan landmass.

6.    **Military assets pre-positioned in October 2011**.  In addition to records regarding the attack on US facilities in Benghazi, Libya, on September 11th and 12th, we also seek records identifying DoD assets pre-positioned **off the coast of Tripoli** on October 18, 2011, when Secretary Clinton visited Libya.

75.    In an effort to avoid the necessity of Africa Command to refer the requests to other components of defendant Department of Defense, plaintiffs' FOIA request notes:

> [R]ecords sought in Request No. 2, regarding any appeals for help for Special Mission Compound or CIA Annex personnel, made to the Turkish or Italian Consulates or the U.K. Security Team, is simultaneously being submitted to OSD/JS (Office of the Secretary of Defense and the Joint Staff).  Request No. 3, for maps of depicting assets, is simultaneously being made to (a) the HQ USEUCOM (U.S. European Command), (b) the United States Central Command CCJ6-RDF (FOIA), and (c) OSD/JS (Office of the Secretary of Defense and the Joint Staff).

76.    Plaintiffs' FOIA request also sought:

    (a)     Recognition as a member of the news media fee waivers under 5 U.S.C. § 552 (a)(4)(A)(ii)(II);

    (b)     A public interest waiver of duplication fees under 5 U.S.C. § 552(a)(4)(A)(iii); and

    (c)     Expedited processing under U.S.C. § 552 (a)(4)(A)(ii)(II).

77.     By correspondence on April 14, 2014, defendant denied plaintiffs' request for expedited processing, and similarly denied plaintiff's requests for news media and public interest statutory fee waivers.

78.     Plaintiffs' June 12, 2014 administrative appeal includes their points and authorities recounted above.

79.     By letter dated June 18, 2014, Africa Command notified plaintiffs that it was "unable to complete your appeal within the [twenty working-day] statutory time requirement."

Exhaustion of
<u>Administrative Remedies</u>

80.     By letter dated August 25, Africa Command responded to plaintiffs' June 12 administrative appeal, granting plaintiffs' prayer to be recognized as members of the news media under 5 U.S.C. § 552 (a)(4)(A)(ii)(II), and granting them a public interest waiver of duplication fees under 5 U.S.C. § 552(a)(4)(A)(iii), but denying their request for expedited processing.

**Special Operations Command**
**<u>March 31, 2014 FOIA Request</u>**

81.     On March 31, 2014, by certified mail to defendant Special Operations Command, plaintiffs requested "disclosure of records regarding the attack on US

facilities in Benghazi, Libya, on September 11th and 12th, 2012."  Specifically,

plaintiffs seek disclosure of:

1.  **Rota**.  Records revealing the status of **two Marine Corps Fleet Antiterrorism Security Teams** ("FAST"), at the Spanish naval base Naval Station Rota ("NAVSTA Rota"), including:
    (a)  All **communications** with, and **orders** to, NAVSTA Rota personnel to get ready to deploy, and, if applicable, to deploy, to Benghazi; and
    (b)  All communications from NAVSTA Rota personnel notifying command that assets were ready to deploy, and, if applicable, that aircraft was airborne, bound for Benghazi, and, if applicable, orders to abort or turn back.

2.  **Croatia.**  Records regarding the readiness status of, and orders given to, **airborne special operations unit, Commanders In-extremis Force** ("CIF"), assigned to the European Command, and **in Croatia**, including:
    (a)  **Orders** for the CIF to deploy to NAS Sigonella; and
    (b)  All **communications** from the CIF notifying command that it was ready to deploy, and, if applicable, that aircraft was airborne, bound for NAS Sigonella, and, if applicable, orders to abort or turn back.

3.  **United States**.  Records disclosing the readiness status of, and orders given to,  **Special Operations Forces** ("Special Ops" or "SOF") **in the United States**, including:
    (a)  **Orders** for Special Ops to deploy to Libya; and
    (b)  **Communications** from SOF notifying command that it was ready to deploy, and, if applicable, that aircraft was airborne, bound for Libya, and, if applicable, orders to abort or turn back.

4.  **"Feet dry over Libya" radio transmission.**  Any record of transmission from any aircraft during the crisis that stated, "Feet dry over Libya," or words to that effect, informing that aircraft was transitioning from above the Mediterranean Sea to above the Libyan landmass.

82.  And plaintiffs' FOIA request sought:

(a)  Recognition as a member of the news media fee waivers under 5 U.S.C. § 552 (a)(4)(A)(ii)(II);

(b)     A public interest waiver of duplication fees under 5 U.S.C. §
552(a)(4)(A)(iii); and

(c)     Expedited processing under U.S.C. § 552 (a)(4)(A)(ii)(II).

83.     In an effort to avoid the necessity of Special Operations Command to

refer the requests to other components of the DOD, plaintiffs' FOIA request

included:

> Kindly note that Request No. 1, regarding orders given to the
> two Marine Corps Fleet Antiterrorism Security Teams at Naval
> Station Rota, is being simultaneously submitted to (a) the
> Commandant of the Marine Corps, and (2) HQ USEUCOM (U.S.
> European Command).  Request No. 2, seeking orders given to
> the Commanders In-extremis Force in Croatia, is also being
> made to (a) the Department of the Army, and (b) HQ USEUCOM
> (U.S. European Command).  Request No. 4, for the radio
> transmission recording, "Feet dry over Libya" or the like, is
> also submitted to (a) the Air Force, and (b) HQ U.S. AFRICOM
> (U.S. Africa Command).

84.     Defendant Special Operations Command has failed to acknowledge

receipt of plaintiffs' FOIA requests or otherwise respond.

Constructive Exhaustion
of Administrative Remedies

85.     The twenty day period since March 31 was in April.  Special

Operations has not responded, and, so, plaintiffs have constructively exhausted their

administrative remedies by virtue of the DOD's failure to respond within twenty

working days under 5 U.S.C. § 552 (b)(6)(A)(i).

**Office of Secretary of Defense and Joint Staff
March 31, 2014 FOIA Request**

86.     On March 31, 2014, by certified mail to defendant Office of Secretary

of Defense and Joint Staff, plaintiffs wrote, "FOIA request Nos.  1, 2 and 3 are for

disclosure of records regarding the attack on US facilities in Benghazi, Libya, on

September 11th and 12th, 2012."  Specifically, the CCB sought production of:

1.    **Maps.**  Maps depicting **all assets** that could have been dispatched to the Benghazi mission or the CIA annex facility on September 11th and 12th, 2012, regardless of such maps were created before or after September 11, 2012.

2.    **Appeals for help**.  Records of requests for help for the Special Mission Compound and the CIA Annex, to:
(a)    The **Turkish Consulate** in Benghazi;
(b)    The **Italian Consulate** in Benghazi; and
(c)    The **U.K. Security Team**.

3.    Records concerning **joint military contingency plans**:
(a)    **Plan Identification (PID) Number and title of the operation plan or plans** prepared using Deliberate Planning procedures, found in Joint Publication 5-0, Joint Operation Plan, August 2011, for use by the supported combatant commander (1) to support military, diplomatic and interagency activities in Libya, through 2012, and (2) to support the military crisis response to the attacks on the Benghazi facilities on September 11 and 12, 2012.
(b)    **Operation plan or plans** for use by the supported combatant commander to support military crisis response to the attacks on the Benghazi facilities on September 11 and 12, 2012.
(c)    List of commands, organizations and agencies comprising the **joint planning and execution community** (JPEC), found in Joint Publication 5-0, Joint Operation Plan, August 2011, which developed, coordinated, and approved the operation plans referred to under (a) above.
(d)    Supported **combatant commander's Joint Intelligence Preparation** of the Operational Environment (JIPOE), developed to support the plans referenced under (a) above.
(e)    List of commands, organizations, agencies and offices comprising the **supported combatant commander's joint interagency coordinating group** (JIACG), established to support the plans referenced under (a) above.

(f)     Copies of any c**ombatant command commercial contracts established to support military, diplomatic and interagency activities at Tripoli and at Benghazi** prior to the attacks on the Benghazi facilities on September 11 and 12,  2012.

4.     **Military assets pre-positioned in October 2011**.  In addition to records regarding the attack on US facilities in Benghazi, Libya, on September 11th and 12th, we also seek records identifying DoD assets pre-positioned **off the coast of Tripoli** on October 18, 2011, when Secretary Clinton visited Libya.

87.     A Plaintiffs' FOIA request also sought:

(a)     Recognition as a member of the news media fee waivers under 5 U.S.C. § 552 (a)(4)(A)(ii)(II);

(b)     A public interest waiver of duplication fees under 5 U.S.C. § 552(a)(4)(A)(iii); and

(c)     Expedited processing under U.S.C. § 552 (a)(4)(A)(ii)(II).

88.     In an effort to avoid the necessity of defendant Office of Secretary of Defense and Joint Staff to refer the requests to other components of the DOD, plaintiffs' FOIA request states:

> Kindly note that Request No. 1, seeking maps of assets, is also being simultaneously made to (a) HQ USEUCOM (U.S. European Command), (b) United States Central Command CCJ6-RDF (FOIA), and (c) HQ U.S. AFRICOM (U.S. Africa Command). Request No. 2, for records of requests for assistance from the Turkish or Italian Consulates or the U.K. Security Team, as well as Request No. 4, regarding records of military assets pre-positioned in October 2011 off Tripoli on October 18, 2011, is also being submitted to (a) the Secretary of the Navy Chief of Naval Operations (SECNAV/CNO), and (b) HQ U.S. AFRICOM (U.S. Africa Command).

89.     By correspondence on April 10, 2014, Office of Secretary of Defense and Joint Staff denied plaintiffs' request for expedited processing, and failed to grant plaintiff's prayers for news media and public interest statutory fee waivers.

90.     On June 6, 2014, plaintiffs administratively appealed the denial of

expedited processing, and include additional points and authorities in support of

their prayers for statutory fee waivers and expedited processing.

91.     By letter dated July 3, 2014, European Command notified plaintiffs

that it was "unable to complete your appeal within the [twenty working-day]

statutory time requirement."

Exhaustion of
Administrative Remedies

92.     Defendant received plaintiffs' administrative appeal in mid-June.  It

has not to date decided plaintiffs' appeal.  Taking into account defendant's ten

working day extension, the subject of its July 3 letter under 5 U.S.C. § 552

(b)(6)(A)(i), the time for European Command to rule on plaintiff's appeal has run,

and plaintiffs have exhausted their administrative remedies.

**Defense Intelligence Agency
First FOIA Request—April 7, 2014**

93.     On April 7, 2014, by certified mail to the Defense Intelligence Agency,

plaintiffs requested disclosure of records regarding the attack on US facilities in

Benghazi, Libya, on September 11th and 12th, 2012.  Specifically, plaintiffs sought

disclosure of:

1.     **Maps.**  Maps depicting **all assets** within fifteen hundred
       miles of Benghazi, Libya, on September 11th and 12th, 2012,
       regardless of such maps were created before or after
       September 11, 2012**.**

2.     **Military assets pre-positioned in October 2011**.  Records
       of all Defense Department assets that were pre-positioned **off
       the coast of Tripoli on October 18, 2011**, when Secretary
       Clinton  visited Libya.

39

3. **Terrorist threat in 2012**. For the calendar year 2012, **records of the threat** to U.S. personnel because of al-Qaida or Ansar al-Shariah or other belligerent build-up in Benghazi, including photographs.

94. In an effort to avoid the necessity of defendant Defense Intelligence Agency to refer the requests to other components of defendant Department of Defense, plaintiffs' FOIA request recites:

Kindly note that on March 31st, <u>Request No. 1</u>, seeking maps of assets, was also made to (a) HQ USEUCOM (U.S. European Command), (b) United States Central Command CCJ6-RDF (FOIA), (c) HQ U.S. AFRICOM (U.S. Africa Command), and (d) OSD/JS (Office of the Secretary of Defense and the Joint Staff). <u>Request No. 2</u>, regarding records of military assets pre-positioned off Tripoli on October 18, 2011, was also submitted on March 31st to (a) the Secretary of the Navy Chief of Naval Operations (SECNAV/CNO), (b) HQ U.S. AFRICOM (U.S. Africa Command), and (c) OSD/JS (Office of the Secretary of Defense and the Joint Staff).

95. Plaintiffs' FOIA request sought:

(a) Recognition as a member of the news media fee waivers under 5 U.S.C. § 552 (a)(4)(A)(ii)(II);

(b) A public interest waiver of duplication fees under 5 U.S.C. § 552(a)(4)(A)(iii); and

(c) Expedited processing under U.S.C. § 552 (a)(4)(A)(ii)(II).

96. Defendant Defense Intelligence Agency has failed to acknowledge receipt of plaintiffs' FOIA requests or otherwise respond to plaintiffs' April 7, 2014 FOIA request.

Constructive Exhaustion
of Administrative Remedies

97. The twenty day period since DOD's receipt of plaintiffs' April 7 FOIA request expired in May. The Defense Intelligence Agency has not to date responded,

and plaintiffs have constructively exhausted their administrative remedies by the

DOD's failure to respond within twenty working days.  5 U.S.C. § 552 (b)(6)(A)(i).

### Defense Intelligence Agency
### Second FOIA Request—May 28, 2014

98.     On May 28, 2014, by certified mail to defendant Defense Intelligence

Agency, plaintiffs requested disclosure of records regarding the attack on US

facilities in Benghazi, Libya, on September 11th and 12th, 2012.  Specifically,

plaintiffs sought disclosure of:

1.  **Op Rep 3's**. The OPEREP-3 PINNACLE **reports used** to
    provide any Department of Defense division (or office or
    entity) with notification of, or **information about**, the
    September 11th and 12th, 2012 **attacks** on U.S. facilities in
    Benghazi, Libya.

2.  **Orders regarding readiness status**.  For the period of July 1,
    2012, through September 30, 2012, records of all **directives,
    orders and other communications regarding the readiness
    status** of United States armed forces on the anniversary of the
    September 11th,  2001, attacks on the World Trade center, to
    or from:

    > EUCOM (European Command);
    > CENTCOM (United States Central Command);
    > AFRICOM (U.S. Africa Command);
    > USSOCOM (Special Operations Command);
    > OSD/JS (Office of Secretary of Defense and Joint Staff);
    > Naval Air Station Sigonella, Sicily;
    > Spanish naval base Naval Station Rota, Spain;
    > Aviano Air Base iii northeastern Italy; and
    > Special Operations Forces in the United States

99.     Plaintiffs' FOIA request sought (a) news media fee waivers under 5

U.S.C. § 552 (a)(4)(A)(ii)(II),  (b)  a public interest waiver of duplication fees under 5

U.S.C. § 552(a)(4)(A)(iii), and (c) expedited processing under U.S.C. § 552

(a)(4)(A)(ii)(II).

100.     By correspondence on May 28, 2014, defendant denied plaintiffs'

request for expedited processing, and failed to grant plaintiff's requests for

statutory fee waivers.

101.     On July 7, 2014, plaintiffs administratively appealed.  That appeal

begins:

> This letter is an appeal of the Defense Intelligence Agency's
> June 30, 2014 denial of expedited processing for the captioned
> May 28 FOIA request.  As I have received no response to the
> April 7, FOIA request (a copy of which I enclose), if possible,
> kindly include this submission in the record of the appeal of
> the April 7, 2014 FOIA request.

102.     Plaintiffs' appeal includes the additional points and authorities in

support of their prayers for expedited processing and fee waivers, as described

above.

Exhaustion of
Administrative Remedies

103.     The Defense Intelligence Agency received plaintiffs' July 7 appeal in

mid-July.  The applicable twenty-day period expired in mid-August.  The DOD has

not ruled on plaintiffs' administrative appeal, and, thus, plaintiffs have exhausted

their administrative remedies by this failure to respond within twenty working

days, under 5 U.S.C. § 552 (b)(6)(A)(i).

**DEPARTMENT OF STATE**
**First FOIA Request—February 21, 2014**

104.     On February 21, 2014, by certified mail to defendant State

Department, plaintiffs made the following FOIA requests for records activities in

Libya:

1.    All records of whatsoever nature regarding… the **CIA Annex**, for the time period of January 1st, 2011, through September 30th, 2012.  This request is all-inclusive for all records, however recorded, including emails, reports, memoranda, correspondence, teletypes, telephone calls, text messages, and audio and video recordings, regarding all uses of the Benghazi consulate and CIA Annex.  Responsive records include those that disclose:

(1)    The **comings and goings** of all persons, whether civilian, military, American or foreign, including any non-US personnel questioned, interrogated, detained, or transported through, the CIA Annex…

(2)    The descriptions and inventories of all **weapons** brought into the Annex;

(3)    The sources of all such weapons;

(4)    The descriptions and inventories of all weapons removed from the Annex,

(5)    The **intended destinations and recipients of all such weaponry**, including

    (i)    All transfers of arms and equipment to Libyan resistance fighters, both before or after the United Nations recognized the National Transitional Council as the legal representative of Libya;

    (ii)    Transportation of arms and equipment from Libya into Turkey; and

    (iii)    US Government supply of weapons into Syria.

(6)    All **communication and cryptographic equipment** at the CIA Annex…

(7)    The weaponry, communication, and cryptographic equipment, that **may have been left in the Annex…** when US personnel abandoned these facilities on September 11th and 12th, 2012;

(8)    Information about the **weapons recovered** from fallen attackers at the Ambassador's compound as well as the CIA Annex during and after the attacks;

(9)    Information about the identities and affiliations of any of those **fallen fighters** as well as the disposition of their bodies, alive or dead; and

*    *    *

[Request 1 (10) withdrawn]

2.    Any and all **videos** depicting the United States Consulate in Benghazi, Libya (including the Special Mission Compound and the Annex)  between September 10, 2012 and September 12, 2012.  This request includes, but is not limited to (1) all videos

and photographs obtained, transmitted, or recorded via any unmanned aerial vehicles (UAVs), and (2) video of closed-circuit television monitor at the Benghazi Mission facility's Tactical Operations Center on September 11th and 12th, 2013.

3.      All records generated between September 11, 2012 and the present, by survivors of the September 11th and 12th attacks on the Benghazi mission and the Benghazi CIA Annex, or by any person regarding the **survivors' accounts** of the attack.

4.      All records of radio **communications** emanating from the Compound's **Tactical Operations Center** (TOC), on September 11th and 12th, 2012, whether made by Regional Security Officer (RSO) Alec Henderson or any other person.

*       *       *

[Request 5 withdrawn]

6.      All records of Secretary **Clinton's actions and communications** for the 24-hour period beginning when first notified that the Benghazi Consulate was under attack. Responsive records include:

(1)      All records generated by Secretary Clinton, including all emails, memoranda, or notes;

(2)      Telephone logs or bills or other statements of all of her telephone calls placed or received; and

(3)      All records generated by anyone about the Secretary's actions and communications.

*       *       *

[Requests 7 and 8 withdrawn]

9.      All records of the **purpose** of Ambassador Stevens' meetings on September 11, 2012, including **analysis or assessments** of **those meetings**, whether written before or after September 11, 2012.

*       *       *

[Requests 10 withdrawn]

11.     All notes, memoranda, and correspondence generated between January of 2007 and September 11, 2012, regarding meetings between Christopher **Stevens or any other Tripoli Embassy official, and one or more of the following** individuals:[1]

●      Ahmed Abu Khattala, a **commander** of the Libyan **Ansar al-Shariah** militia group

---

[1]      FOIA Request for records of State Department meetings with nine named individuals also made to CIA.

- Mustafa Abdul Jalil, **Chairman of the Libyan National Transitional Council** from 5 March 2011-8 August 2012
- Mahmoud Jibril, **Interim Prime Minister of Libya** and Chair of the Executive Board of the National Transitional Council from 5 March-23 October 2011
- Wissam bin Hamid, a Libya Shield Brigade commander, supporter of the Libyan Muslim Brotherhood Justice & Construction Party, and veteran jihad fighter of Iraq & Afghanistan, who provided security for US representatives in Benghazi and was tentatively identified by the Library of Congress as the **head of al-Qa'eda in Libya**
- Abdelhakim Belhadj (aka Abdallah al Sadeq), veteran jihad fighter of Iraq & Afghanistan, **commander** of the AQ franchise militia, **Libyan Islamic Fighting Group** (LIFG) (aka Libyan    Islamic Movement for Change), post-revolution military commander of Tripoli, and Libyan delegation leader to the Syrian Free Army in late 2011
- Ismael al-Sallabi (brother of Ali), **commander** of the Al-Qa'eda-linked **al-Sahati Brigade** during the revolution, and Benghazi Military Council commander afterwards, close ally of Abdelhakim Belhadj and Mustafa Jalil
- Ali al-Sallabi (brother of Ismael), called the 'spiritual leader' of the Libyan revolution, Muslim Brotherhood links, **led effort** with Seif al-Qaddafi and US Embassy Tripoli **to gain release of jihadi detainees from Libyan jails**
- Mohammad al-Sallabi, father of Ali and Ismael, among the **founders of the Libyan Muslim Brotherhood** in the 1960s
- Abu Sufian bin Qumu, veteran jihad fighter in Afghanistan from Derna, Libya, captured in 2001, detained at GITMO, sent back to Libyan jail, released in 2010, led jihad vs Qaddafi in 2011, and [said to have] **led Benghazi Mission attack** in Sep 2012.

*      *      *

[Requests 12, 13 and 14 withdrawn]

15. Records of the **names**, and titles, of individuals indentified only as "**Senior State Department Official** Number One" and "Senior State Department Official Number Two" during the **October 9, 2012, Background Briefing** on Libya, given by the Office of the Spokesperson, the transcript of which was

publicly disclosed, titled, "Background Conference Call With Senior State Department Officials."

105.    By letter dated May 5, 2014, plaintiffs narrowed this February 21 State Department FOIA request, writing:

> Request number one as currently written begins:

>> All records of whatsoever nature regarding (1) the Benghazi consulate and (2) its CIA Annex, for the time period of January 1st, 2011, through September 30th, 2012.  This request is all-inclusive for all records, however recorded, including emails, reports, memoranda, correspondence, teletypes, telephone calls, text messages, and audio and video recordings, regarding all uses of the Benghazi consulate and CIA Annex.  Responsive records include those that disclose...

> Please note that we hereby narrow this item to exclude any records "regarding (1) the Benghazi consulate," leaving only records in State's custody regarding (2), the CIA annex.  Thus, full disclosure under this item will still reveal the relationship between State and CIA activities at the annex, but will eliminate the necessity to produce numerous other records.

106.    By letter dated August 5, 2014, plaintiffs further narrowed this FOIA request to the State Department:

> Please note that we further narrow the requests, and withdraw Request Nos. 1(10), 5, 7, 8, 10, 12, 13, and 14.  <u>Request 1(10)</u> sought CIA situation reports.  <u>Request 5</u> sought "records of Secretary Panetta's actions and communications..."  <u>Request 7</u> asked for disclosure of records of "the President's first notification that the Benghazi Consulate was under attack..." <u>Request 8</u> sought disclosure of records reflecting Ambassador Stevens' schedule on September 11, 2012.  <u>Request 10</u> sought disclosure Ambassador Stevens correspondence on September 10th and 11th, 2012.  <u>Request 12</u> sought "DOD and CIA... records shared with members of Congress regarding... collection, storage, transportation of arms and equipment in Libya."  <u>Request 13</u> asked that "DOD and CIA... records of Congressional approval for CIA transport of arms to Syrian rebel forces" be disclosed.  <u>Request 14</u> sought "records regarding Deputy National Security Adviser for Homeland

Security and Counter-terrorism John Brennan's recommendations regarding the overthrow of Libyan leader Muammar Gaddafi."

107.    By letter dated March 21, the State Department granted plaintiffs news media status, but denied their request for expedited processing, writing that they "have not provided adequate justification for expedition."

108.    On April 18, 2014, plaintiffs administratively appealed the denial of expedited processing.

Exhaustion of
Administrative Remedies

109.    On May 8, 2014, defendant State Department denied plaintiffs' appeal of its request for expedited processing.  Plaintiffs have exhausted their administrative remedies, under 5 U.S.C. § 552 (b)(6)(A)(i).

**State Department
Second FOIA Request—April 7, 2014**

110.    On April 7, 2014, by certified mail to defendant State Department, plaintiffs made five more FOIA requests.  Also seeking news media fee waivers, and expedited processing, plaintiffs requested:

1.    Records generated from August 2009, through October of 2011, regarding Secretary of State **Clinton's recommendations** regarding U.S. support to those seeking **to oust** forces loyal to Colonel Muammar **Gaddafi** and his government.

2.    Records generated from March of 2011 through September of 2012, regarding Secretary of State **Clinton's recommendations to support those seeking to oust** forces loyal to the government of Bashar al-**Assad**.

3.    Records of communications sent from, received by, or routed through, Secretary Clinton's office regarding the **need for a "permanent constituent post" in Benghazi**, as well as

47

records regarding Secretary of State Clinton's decision to continue operations in Benghazi, including **the extent to which the Benghazi Mission in any way facilitated the existence and operations of the CIA Annex**.

4.   Records indentifying **DoD assets pre-positioned off the coast of Tripoli** when Secretary Clinton visited Libya in **October of 2011**.

5.   Records generated from Secretary **Clinton's** September 11th and 12th, 2012 **requests for help**[2] for personnel at the Special Mission Compound and the CIA Annex, to:

(a)   The **Libyan government**;
(b)   The **Turkish Consulate** in Benghazi;
(c)   The **Italian Consulate** in Benghazi; and
(d)   The **U.K. Security Team**.

111.   By letter dated April 21, the State Department granted plaintiffs news media status, but denied their request for expedited processing.

112.   Because plaintiffs neglected to timely appeal the State Department's denial of expedited processing, on July 1, 2014, plaintiffs wrote:

Kindly consider accepting this letter as an appeal of the State Department's April 21 denial of expedited processing of the captioned April 7, 2014, FOIA request.  Alternatively, this letter is a part of the accompanying July 1 FOIA request, submitted in support of prayers for fee waivers and expedited processing. The April 7, 2014, FOIA request, and the July 1 FOIA request, are identical.

Plaintiffs' July 1 submission includes its additional points and authorities in support of its request for expedited processing under 5 U.S.C. § 552 (a)(4)(A)(ii)(II).

Exhaustion of
Administrative Remedies

113.   On August 25. 2014, the State Department responded that it was treating plaintiffs' July 1 submission as a late-filed "appeal of the denial of

---

[2]   FOIA Request for records of requests for help from allies also made to DOD's Africa Command and Office of the Secretary of Defense and the Joint Staff.

expeditious processing in your April 7 request," but "uph[eld] the decision to deny

expeditious processing."  Thus, plaintiffs have exhausted their administrative

remedies.

### FEDERAL BUREAU OF INVESTIGATION
### February 21, 2014 FOIA Request

114.    On February 21, 2014, by certified mail to defendant FBI, plaintiffs

requested disclosure of "the following records of activities in Libya... regardless of

the source" of the records:

1.    All records describing or defining the purpose, scope, **jurisdiction,** and power of the FBI's investigation into the Benghazi attacks, including the identity of government official(s) requesting or ordering the probe.

2.    All records of the **Bureau's findings in its investigation** into the Benghazi attacks.  Responsive records include those that regard
   (1)    the identities of any non-US personnel questioned, interrogated, detained, or transported through, the Annex,
   (2)    **weapons** brought into, and removed from, the Annex, as well as such weaponry's destinations including whether abandoned on September 12, 2012,
   (3)    **communication and cryptographic equipment** left in the Consulate and Annex when US personnel abandoned the facilities on September 12, 2012...
                        *       *       *
   [Request Nos. 2 (4), 3 and 4 withdrawn]

5.    All records generated between September 11, 2012 and the present, by survivors of the September 11th and 12th attacks on the Benghazi mission and the Benghazi CIA Annex, or by any person regarding the **survivors' accounts** of the attack.

   [Request No. 6 withdrawn]

7. All records of the purpose of Ambassador Stevens' **meetings on September 11**, 2012, including analysis or assessments of those meetings, whether written before or after September 11, 2012.

8. September **15th or 16th FBI 302 Interview Reports**, and corresponding handwritten notes, of interviews conducted in Germany of United States personnel who had been in the Benghazi mission and the Benghazi CIA annex during the September 11th and 12th attacks on those facilities.

9. Records of the **video teleconference** on the afternoon of the September 16th, 2012, between the FBI and other IC officials in Washington, regarding FBI interviews with U.S. personnel who had been on the compounds in Benghazi during the attack. For your reference, the following is an excerpt from the December 30, 2012, Senate Committee On Homeland Security And Governmental Affairs, "Flashing Red:  A Special Report On The Terrorist Attack At Benghazi:"  On September 15th and 16th, officials from the FBI conducted face-to-face interviews...

10. Complete **Autopsy Reports** of each of the victims of the September 11th and 12th, 2012, Benghazi attacks of the Ambassador's compound, and the CIA Annex.

115. Plaintiffs' FOIA request sought:

(a) News media fee waivers under 5 U.S.C. § 552 (a)(4)(A)(ii)(II); and

(b) A public interest waiver of duplication fees under 5 U.S.C. § 552(a)(4)(A)(iii).

116. On March 14, 2014, the FBI denied the requests in their entirely, reasoning that, because plaintiffs "have requested information about a third party," they should provide an "authorization and consent from the individual(s)," or "proof of death," or "justification that the public interest in disclosure outweighs personal privacy."  "In the absence of such information," the response continued, the FBI "can neither confirm nor deny the existence of any records responsive to your request,

which, if they were to exist, would be exempt from disclosure pursuant to FOIA

Exemptions (b)(6) and (b)(7)(C), 5 U.S.C. §§ 552 (b)(6) and (b)(7)(C)."

117.   On March 31, 2014, plaintiffs administratively appealed, writing that

"withholdings under FOIA Exemptions (b)(6) and (b)(7)(C) cannot justify the FBI's

blanket denial" because release most of the information sought would implicate no

privacy concerns, and that redactions and segregation could vitiate any privacy

concerns.  "In sum," plaintiffs reasoned, disclosure of half of the information sought

would implicate no privacy interest.  As to the other half, plaintiff observed:

> [T]here are no personal privacy interests in the records sought
> that could not be protected by proper redaction and
> segregation, and the absence of any third-party releases does
> not justify the FBI's blanket withholding.  Moreover, the public
> interest in disclosure outweighs any cognizable personal
> privacy interests that may otherwise justify non-disclosure.
> The Benghazi tragedy and its aftermath is subject of numerous
> congressional probes and widespread, ongoing, publicity.  The
> information sought is in the public interest because it is likely
> to contribute significantly to public understanding of the
> operations or activities of the government and its inner
> workings.  Disclosure will show the degree to which the
> Executive Branch has complied in good faith with relevant law,
> and whether it accurately informed Congress and the public
> about the Benghazi tragedy.

118.   This March 31, Administrative appeal also narrowed the FBI FOIA

requests, regarding the autopsy reports.  Plaintiffs wrote:

> Insofar as the request for complete autopsy reports of the
> victims of the September 11th and 12th, 2012 Benghazi
> attacks, the subject of Request 10, we agree that personal
> privacy interests justifies their non-disclosure, at least in the
> absence of a release by the primary next-of-kin.  However,
> these FOIA requests seek to reveal, among other things,
> whether the FBI is conducting a thorough investigation.  Thus,
> whether this murder probe includes any review of the autopsy
> reports should be disclosed, and almost any response, even
> one withholding the reports, would suffice.

119.    By letter dated August 5, 2014, plaintiffs further narrowed their FOIA request to the FBI, writing:

> Please note that we further narrow the requests to withdraw Request Nos. 2(4), 3, 4, and 6.  Request No. 2(4) sought records of "any probe into the meetings from January 2007 through September 2012 between Tripoli Embassy officials, including Christopher Stevens, and the individuals identified in the following Request 3 below."  Additionally, plaintiffs withdraw Request No. 3, which sought records "regarding meetings between Christopher Stevens or any other Tripoli Embassy official, and one or more of the following [nine] individuals..." Request No. 4 sought disclosure of "records of whatsoever nature regarding (1) the Benghazi consulate and (2) its CIA Annex for the time period of January 1st, 2011, through September 30th, 2012..."   Lastly, Request No. 6 sought copies of "[a]ll calendars, day books, journals, notes, memoranda, or other records reflecting Ambassador Stevens' schedule on September 11..."

120.    On July 8, 2014, defendant FBI reversed its initial determination, and "remand[ed] your clients' request for a search for responsive records."  Although the FBI's reversal did not seek a commitment from plaintiffs to pay search or review fees, it did not grant plaintiffs' request to be treated as a member of the news media under 5 U.S.C. § 552 (a)(4)(A)(ii)(II).

Exhaustion of
Administrative Remedies

121.    On July 10, 2014, plaintiffs sent, by overnight "express mail," a letter "submitted in [further] support of prayers for fee waivers, and expedited processing, for the captioned request."  In this submission, plaintiffs explained that "the letter was submitted on July 7 for inclusion in the record on appeal, but, on July 9, I received a letter by email that the case had been remanded on July 8."

122.    Twenty working days since plaintiffs' February 21 FOIA request has long since passed.  The FBI has not yet responded to plaintiffs' request for news media fee waiver under 5 U.S.C. § 552 (a)(4)(A)(ii)(II), or their request for a public interest waiver of duplication fees under 5 U.S.C. § 552(a)(4)(A)(iii).  Nor has it produced any records, or demonstrated that records are exempt from disclosure. Plaintiffs have exhausted their administrative remedies under 5 U.S.C. § 552 (b)(6)(A)(i).

Exhaustion of<br>
Administrative Remedies—Expedited Processing

123.    By August 19 letter, the FBI wrote to plaintiff that the "administrative appeal from the action of the Federal Bureau of Investigation was received by this Office on August 14, 2014."  However, the Bureau received plaintiffs' July 10 submission on July 11, 2014.  The use of August 14 as the date of the FBI's receipt of the materials is an incorrect chronology, and the twentieth day since plaintiffs submitted their July 10 expedited processing appeal was mid-August.  However, by letter dated July 31, the FBI wrote that plaintiffs had filed a duplicate appeal, and that it had closed that matter.  In any event, plaintiffs have constructively exhausted their administrative remedies under 5 U.S.C. § 552 (b)(6)(A)(i), regarding "News Media" status.

**CENTRAL INTELLIGENCE AGENCY**<br>
**February 24, 2014 FOIA Request**

124.    On February 24, 2014, by certified mail to defendant CIA, plaintiffs requested disclosure of "the following records of activities" in Libya:

1.      All records of whatsoever nature regarding (1) the Benghazi Special Mission Compound or "Ambassador's compound" or "**Benghazi Mission**" and (2) the **CIA Annex**, for the time period of January 1st, 2011, through September 30th, 2012. This request is all-inclusive for all records, however recorded, including emails, reports, memoranda, correspondence, teletypes, telephone calls, text messages, and audio and video recordings, regarding all uses of the Benghazi Mission and the CIA Annex.  Responsive records include those that disclose:

(1)     The comings and goings of all persons, whether civilian, military, American or foreign, including any non-US personnel questioned, interrogated, detained, or transported through, the CIA Annex and Benghazi Mission;

(2)     The descriptions and inventories of **all weapons** brought into the **Annex**, including small arms, ammunition, and man-portable air defense systems, or **Manpads,** and missiles;

(3)     The **sources** of all such weapons;

(4)     The descriptions and inventories of all weapons removed from the Annex,

(5)     The intended **destinations and recipients** of all such weaponry, including

(i)     All transfers of arms and equipment to Libyan resistance fighters, both before or after the United Nations recognized the National Transitional Council as the legal representative of Libya;

(ii)    Transportation of **arms out of Libya**, bound for Syria, thorough Turkey, Qatar, Saudi Arabia, Qatar, or Jordan;

(6)     All communication and cryptographic equipment at the CIA Annex and Benghazi Mission;

(7)     The weaponry, communication, cryptographic equipment, and electronic or paper files, left in the Annex and Benghazi Mission when US personnel abandoned these facilities on September 11th and 12th, 2012;

(8)     Information about the weapons recovered from fallen attackers at the Ambassador's compound as well as the CIA Annex during and after the attacks;

(9)     Information about the identities and affiliations of any of those fallen fighters as well as the disposition of their bodies, alive or dead; and

(10)    CIA situation reports, or "sitreps," sent, including on September 11th, 12th, and 13th.

2.      Any and all **videos** depicting the United States Mission in Benghazi, Libya (including the Special Mission Compound and the CIA Annex)  between September 10, 2012 and September 12, 2012.  This request includes, but is not limited to (1) all videos and photographs obtained, transmitted, or recorded via any unmanned aerial vehicles (UAVs), and (2) video of closed-circuit television monitor at the Benghazi Mission facility's Tactical Operations Center on September 11th and 12th, 2013.

3.      All records generated between September 11, 2012 and the present, by survivors of the September 11th and 12th attacks on the Benghazi mission and the Benghazi CIA Annex, or by any person regarding the **survivors' accounts** of the attack.

4.      All records of **radio communications** emanating from the Compound's Tactical Operations Center (TOC), on September 11th and 12th, 2012, whether made by Regional Security Officer (RSO) Alec Henderson or any other person.

5.      All records of CIA Director David **Petraeus' actions** and communications for the 24-hour period beginning when first notified that the Benghazi Mission was under attack. Responsive records include:
        (1)     All records generated by Director Petraeus, including all emails, memoranda, or notes;
        (2)     Telephone logs or bills or other statements of all of his telephone calls placed or received; and
        (3)     All records generated by anyone about the CIA Director's actions and communications.

6.      All records of Deputy CIA Director Michael **Morell actions** and communications for the 24-hour period beginning when first notified that the Benghazi Mission was under attack. Responsive records include:
        (1)     All records generated by Deputy CIA Director Morell, including all emails, memoranda, or notes;
        (2)     Telephone logs or bills or other statements of all of his telephone calls placed or received; and
        (3)     All records generated by anyone about the CIA Deputy Director's actions and communications.

                        *       *       *

                [Requests 7 and 8 withdrawn]

9.    All records of the purpose of Ambassador **Stevens' meetings**
on September 11, 2012, including analysis or assessments of
those meetings, whether written before or after September 11,
2012.

*        *        *

[Request 10 withdrawn]

11.   All notes, memoranda, and correspondence generated between
January of 2007 and September 11, 2012, regarding meetings
between Christopher **Stevens or any other Tripoli Embassy
official, and one or more of the following** individuals: [3]

● Ahmed Abu Khattala, a **commander** of the Libyan
**Ansar al-Shariah** militia group

● Mustafa Abdul Jalil, **Chairman of the Libyan National
Transitional Council** from 5 March 2011-8 August
2012

● Mahmoud Jibril, **Interim Prime Minister of Libya** and
Chair of the Executive Board of the National
Transitional Council from 5 March-23 October 2011

● Wissam bin Hamid, a Libya Shield Brigade commander,
supporter of the Libyan Muslim Brotherhood Justice &
Construction Party, and veteran jihad fighter of Iraq &
Afghanistan, who provided security for US
representatives in Benghazi and was tentatively
identified by the Library of Congress as the **head of al-
Qa'eda in Libya**

● Abdelhakim Belhadj (aka Abdallah al Sadeq), veteran
jihad fighter of Iraq & Afghanistan, **commander** of the
AQ franchise militia, **Libyan Islamic Fighting Group**
(LIFG) (aka Libyan    Islamic Movement for Change),
post-revolution military commander of Tripoli, and
Libyan delegation leader to the Syrian Free Army in late
2011

● Ismael al-Sallabi (brother of Ali), **commander** of the Al-
Qa'eda-linked **al-Sahati Brigade** during the revolution,
and Benghazi Military Council commander afterwards,
close ally of Abdelhakim Belhadj and Mustafa Jalil

● Ali al-Sallabi (brother of Ismael), called the 'spiritual
leader' of the Libyan revolution, Muslim Brotherhood
links, **led effort** with Seif al-Qaddafi and US Embassy
Tripoli **to gain release of jihadi detainees from
Libyan jails**

---

[3]    FOIA Request for records of State Department meetings with nine named
individuals also made to the State Department.

- Mohammad al-Sallabi, father of Ali and Ismael, among the **founders of the Libyan Muslim Brotherhood** in the 1960s

- Abu Sufian bin Qumu, veteran jihad fighter in Afghanistan from Derna, Libya, captured in 2001, detained at GITMO, sent back to Libyan jail, released in 2010, led jihad vs Qaddafi in 2011, and [said to have] **led Benghazi Mission attack** in Sep 2012.

12.   For the period of February 15th, 2011, through December 31st, 2012, all DOD and CIA or other intelligence community records, shared **with members of Congress, regarding collection, storage, transportation of arms** and equipment in Libya.

13.   For the period of February 15th, 2011, through December 31st, 2012, all DOD and CIA or other intelligence community records of **Congressional approval for CIA transport of arms** to Syrian rebel forces.

14.   All records regarding Deputy National Security Adviser for Homeland security and Counter-terrorism **John Brennan's recommendations regarding** the overthrow of Libyan leader Muammar **Gaddafi.**

15.   Records of the **video teleconference** on the afternoon of the **September 16th, 2012**, between the FBI and other IC officials in Washington, regarding FBI interviews with U.S. personnel who had been on the compounds in Benghazi during the attack.   For your reference, the following is an excerpt from the December 30, 2012, Senate Committee On Homeland Security And Governmental Affairs, "Flashing Red:  A Special Report On The Terrorist Attack At Benghazi:"

On September 15th and 16th, officials from the FBI conducted face-to-face interviews in Germany of the U.S. personnel who had been on the compound in Benghazi during the attack.  The U.S. personnel who were interviewed saw no indications that there had been a protest prior to the attack. Information from those interviews was shared on a secure video teleconference on the afternoon of the 16th with FBI and other IC officials in Washington; it is unclear whether the question of whether a protest took place was discussed during this video conference.

16.    **Non-Disclosure Agreements** signed by survivors of the Benghazi attacks, including employees or contractors of the CIA or DOD.

125.    Plaintiffs' FOIA request also sought:

(a)    Recognition as a member of the news media fee waivers under 5 U.S.C. § 552 (a)(4)(A)(ii)(II); and

(b)    A public interest waiver of duplication fees under 5 U.S.C. § 552(a)(4)(A)(iii).

126.    By letter dated August 5, 2014, plaintiffs narrowed the request, writing:

> Please note that the FOIA requesters hereby withdraw three of their requests, numbered seven, eight, and ten.  Request 7 sought disclosure of "the President's first notification that the Benghazi Mission was under attack…"  Request 8 sought disclosure of "records reflecting Ambassador Stevens' schedule on September 11, 2012," and Request 10 sought "correspondence to or from Ambassador Stevens on September 10th and 11th, 2012."

127.    By letter dated April 14, 2014, the CIA acknowledged receipt of plaintiffs' request, writing only that its "officers will review your request and will advise you should they encounter any problems or if they cannot begin the search without additional information."

128.    On July 1, 2014, plaintiffs submitted additional points and authorities in support of their requests for statutory fee waivers, and, additionally, sought expedited processing under 5 U.S.C. § 552 (a)(4)(A)(ii)(II).

129.    By letter dated July 17, 2014, the CIA acknowledged receipt of plaintiffs' July 1 submission, and denied plaintiffs' request for expedited processing.

130.    Despite the defendant's failure to apprise plaintiffs of their right to administratively appeal the CIA's position, on July 25, 2014, plaintiffs did appeal. They wrote:

> This is an appeal of the captioned denial of expedited processing.  Additionally, the CIA did not respond to the requesters' prayers for news media and public interest fee waivers.  Nor has the CIA produced any records.  Kindly also accept this as an appeal of these matters.

Exhaustion of
<u>Administrative Remedies</u>

131.    By letter dated July 31, defendant CIA responded to plaintiffs' July 25 administrative appeal.  Defendant granted plaintiffs' request for a news media fee waiver, writing that it had "reviewed your request for a fee waiver and determined that it meets the standard… we will charge no fees associated with the processing of your request," but denied plaintiffs' request for expedited processing, advising that CIA "regulations do not provide for appeals of denials of expedited processing requests."

**Count I**
**Expedited Processing**
**(All Defendants)**

131.    Plaintiffs restate paragraphs 1-130 as if fully repeated here.

132.    All FOIA requests, and corresponding administrative appeals, seek expedited processing, and defendants' failure to expedite the processing of the information sought violates 5 U.S.C. § 552(a)(4)(A)(ii)(II).

**Count II**
**Prompt Disclosure**
**(All Defendants)**

133.    Plaintiffs restate paragraphs 1-132 as if fully repeated here.

134.    As of the date of this complaint, defendants have failed to produce any responsive records, or demonstrate that such records are exempt from disclosure.

135.    Plaintiffs have a statutory right to the records they seek, and there is no legal basis for defendants' refusal to disclose them.

**Count III**
**News Media Status**
**(Defendants FBI and DOD**
**components *except* Navy and Africa Command)**

136.    Plaintiffs restate paragraphs 1-135 as if fully repeated here.

137.    Plaintiffs are entitled to recognition as members of the news media under 5 U.S.C. § 552 (a)(4)(A)(ii)(II).  Defendants FBI and eight of the ten named components of DOD failed to grant plaintiffs news media status, in violation of the FOIA.

**Count IV**
**Public Interest Fee Waiver**
**(All Defendants *except* DOD Navy and Africa Command)**

138.    Plaintiffs restate paragraphs 1-138 as if fully repeated here.

139.    Plaintiffs are entitled to a partial or complete waiver of costs associated with reproduction of the requested records, in the public interest, under 5 U.S.C. § 552(a)(4)(A)(iii).  Defendants have failed to respond this demand.

**WHEREFORE,** plaintiffs respectfully pray that this Court:

I.      Grant plaintiffs' requests for:

    A.      Expedited processing under 5 U.S.C. § 552(a)(4)(A)(ii)(II);

    B.      Status as representatives of the news media under 5 U.S.C. § 552(a)(4)(A)(ii)(II); and

    C.      A waiver of duplication fees under 5 U.S.C. § 552(a)(4)(A)(iii).

II.     Order defendants to:

    A.      Conduct a thorough search for all responsive records;

    B.      Promptly coordinate or refer requested records or portions thereof to other government agencies, as appropriate;

    C.      Provide a *Vaughn* index inventorying all responsive records and itemizing and justifying all withholdings; and

    D.      Promptly disclose the requested information, as it is processed, on a rolling basis, in electronic form.

III.    Award plaintiffs their costs and reasonable attorneys' fees, under 5 U.S.C. § 552 (a)(4)(E) and 28 U.S.C. § 2412(d).

DATE:   September 19, 2014.

Respectfully submitted,


_____ / s/ _____
John H. Clarke   Bar No. 388599
Attorney for plaintiffs
1629 K Street, NW
Suite 300
Washington, DC  20006
(202) 344-0776
johnhclarke@earthlink.net