**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| ACCURACY IN MEDIA, INC., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 14-1589 (EGS) |
| DEPARTMENT OF DEFENSE, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANT DEPARTMENT OF JUSTICE ON ISSUE OF DISCLOSURE OF THREE FBI INTERVIEW REPORTS**

COME NOW plaintiffs Accuracy in Media, Inc., Roger L. Aronoff, Captain Larry W. Bailey, USN (Ret.), Lieutenant Colonel Kenneth Benway, USA (Ret.), Colonel Richard F. Brauer, Jr., USA (Ret.), Clare M. Lopez, Admiral James A. Lyons, Jr., USN (Ret.), and Kevin Michael Shipp, by counsel, and move this Court, under Rule 56 of the Federal Rules of Civil Procedure, for partial summary judgment on the issue of disclosure of FBI 302 Reports of interviews of Mark Geist, Kris Paronto, and John Tiegen, sources for the book, "*13 Hours, The Inside Account of what Really Happened in Benghazi,*" by "Mitchell Zuckoff with the Annex Security Team."

In support of this relief, plaintiffs respectfully submit their attached memorandum, together with the exhibits thereto, and their Statement of Material Facts Not in Dispute.

Date: May 13, 2015.

Respectfully submitted,

/s/

John H. Clarke Bar No. 388599
Attorney for plaintiffs
1629 K Street, NW
Suite 300
Washington, DC 20006
(202) 344-0776
johnhclarke@earthlink.net

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| ACCURACY IN MEDIA, INC., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 14-1589 (EGS) |
| DEPARTMENT OF DEFENSE, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANT DEPARTMENT OF JUSTICE ON ISSUE OF DISCLOSURE OF THREE FBI INTERVIEW REPORTS**

Plaintiffs respectfully submit this memorandum in support of their motion for disclosure of the FBI 302 interview reports of Mark Geist, Kris Paronto, and John Tiegen.

## I. FACTS

### A. FOIA Request

On February 21, 2014, plaintiffs made a FOIA request to the FBI, for disclosure of accounts of witnesses to the September 11 and 12, 2012 attacks, in Benghazi, Libya, including reports of FBI interviews conducted in Germany. *See* Supp. Compl., ECF No. 12, ¶ 126 at 51:

> All records generated between September 11, 2012 and the present, by survivors of the September 11th and 12th attacks on the Benghazi mission and the Benghazi CIA Annex, or by any person regarding the survivors' accounts of the attack.
>
> September 15th or 16th FBI 302 Interview Reports, and corresponding handwritten notes, of interviews conducted in Germany of United States personnel who had been in the Benghazi mission and the Benghazi CIA annex during the September 11th and 12th attacks on those facilities.

Plaintiffs also sought a copy of the next day's video teleconference, which had apprised various intelligence and other administration officials in Washington of the facts of the attacks. *Id.*[1]

**B. Publication of "*13 Hours*"**

Seven months after plaintiffs had submitted this FOIA request, in September of 2014, they filed this lawsuit. That same month, Hatchette Book Group published "*13 Hours*, *The Inside Account of what Really Happened in Benghazi,*" by "Mitchell Zuckoff with the Annex Security Team." Ex 1, 10 pages of *13 Hours*, at 4. The "main sources of this book are the five surviving American security force contractors, known as 'operators'" (*id*. at 5); Dave Benton, Mark Geist, Kris Paronto, Jack Silva, and John Tiegen.

> Based on exclusive firsthand accounts… their intent is to record for history, as accurately as possible, what they did, what they saw, and what happened to them—and to their friends, colleagues, and compatriots—during the Battle of Benghazi…. [Their] only editorial demand was that the story be told truthfully.

*Id*.

1 Supp. Compl., ECF No. 12, ¶ 126 at 51:

> Records of the video teleconference on the afternoon of the September 16th, 2012, between the FBI and other IC officials in Washington, regarding FBI interviews with U.S. personnel who had been on the compounds in Benghazi during the attack. For your reference, the following is an excerpt from the December 30, 2012, Senate Committee On Homeland Security And Governmental Affairs, 'Flashing Red: A Special Report On The Terrorist Attack At Benghazi:
>
> > On September 15th and 16th, officials from the FBI conducted face-to-face interviews in Germany of the U.S. personnel who had been on the compound in Benghazi during the attack. The U.S. personnel who were interviewed saw no indications that there had been a protest prior to the attack. Information from those interviews was shared on a secure video teleconference on the afternoon of the 16th with FBI and other IC officials in Washington; it is unclear whether the question of whether a protest took place was discussed during this video conference.

All dialogue appearing in the book was related firsthand:

> No scenes or chronologies were altered, no dramatic license was taken, and no characters were invented or created from composites. Descriptions from before, during, and immediately after the battle came from the men who were there, from verified accounts, or both. All dialogue was spoken or heard firsthand by primary sources. Thoughts ascribed to individuals came directly from those individuals.

*Id*.

Within five minutes of the first call to the CIA Annex asking for help, these five members of the Agency's Quick Reaction Force ("QRF") at the Annex had "jocked up," and assembled in two armored cars, ready to go. But the CIA Chief of Base, who was in charge, and identified in the book only as "Bob," forbade the rescuers' departure, while he spoke by phone with officials. *13 Hours* relates that Kris Paronto and John Tiegen were repeatedly told to "stand down" and "hold up," until they finally ignored these orders, and responded.

> Standing outside the Mercedes, Tig called out, "Hey, we gotta go now! We're losing the initiative!" "No, **stand down**, you need to wait," Bob the base chief yelled back. "We need to come up with a plan," the Team Leader repeated.
>
> In the meantime, Tanto told the bosses, he and the other operators were overdue to move out. The CIA chief looked at Tanto, then at the Team Leader, then back to Tanto. Tanto felt as though the chief was looking right through him. "**No**," Bob said, "**hold up**. We're going to have the local militia handle it." Tanto couldn't believe his ears. He turned to the Team Leader: "Hey, we need to go." "**No**," the T.L. said, "we need to wait. The chief is trying to coordinate with 17 Feb and let them handle it." "What do you mean, 'Let them handle it?'" Tanto demanded.
>
> "We're being attacked!" one yelled, his voice tight with stress. "There's approximately twenty to thirty armed men, with AKs firing. We're being attacked! We need help! We need help now!" Adrenaline surged through the operators' veins, but again they were told to wait. They were used to following orders, and they knew that insubordination could mean their jobs or worse. But a shared thought took hold in both vehicles: If they weren't given permission to move out soon, they'd take matters into their own hands.

*Id*. at 8-10, emphasis supplied.

Upon the September 2014 publication of "*13 Hours*, *The Inside Account of what Really Happened in Benghazi,*" three of the five Annex security team members—Mark Geist, Kris Paronto, and John Tiegen—have sought, and received, widespread publicity. *See, e.g*., September and October, 2014, interviews with Fox News' broadcasts with Sean Hannity, Greta Van Susteren, followed by multi-state book tour.[2]

### C. Khatallah Indictment

On October 14, 2014, the DOJ unsealed its eighteen-count indictment of Ahmed Abu Khatallah. The indictment is attached as Ex 2,[3] and the docket sheet is Ex 3.[4] The indictment alleges, *inter alia*, that Khatallah was:

> [The] commander of Ubaydah Bin Jarrah ('UBJ'), an Islamist extremist militia in Benghazi, which had the goal of establishing Sharia law in Libya. In approximately 2011, UBJ merged with Ansar al-Sharia ('AAS'), another Islamist extremist group in Libya with the same goal of establishing Sharia law in Libya. KHATALLAH was a Benghazi-based leader of AAS.

---

2 *See also* Dec. 2, 2014, "*Benghazi Heroes Debunk House Intel Report as 'Full of Inaccuracies' with Firsthand Account*" Breitbart.com: "[Kris] Paronto knows specifically of a CIA employee that was poorly treated while in Tripoli due to disagreeing with the story that was being fabricated by the CIA. The CIA employee also filed a complaint with the CIA Inspector General…"

3 Ex 2, Superseding Indictment, Case No. 14-cr-00141(CRC), ECF No. 19, charging Conspiracy to Provide Material Support and Resources to Terrorists Resulting in Death (Count 1), Providing Material Support and Resources to Terrorists Resulting in Death (Count 2), Murder of an Internationally Protected Person (Count 3), Murder of an Officer and Employee of the United States (Counts 4-6), Attempted Murder of an Officer and Employee of the United States (Counts 7-9), Killing a Person in the Course of an Attack on a Federal Facility Involving the Use of a Firearm and a Dangerous Weapon (Counts 10-13), Maliciously Damaging and Destroying U.S. Property by Means of Fire and an Explosive Causing Death (Counts 14-15), Maliciously Destroying and Injuring Dwellings and Property and Placing Lives in Jeopardy within the Special Maritime and Territorial Jurisdiction of the United States and Attempting to Do the Same (Counts 16-17), Using, Carrying, Brandishing, and Discharging a Firearm during a Crime of Violence (Count 18).

4 Ex 3 Docket Sheet, Case No. 14-cr-00141(CRC).

Ex 2 at ¶ 9.

Further, the indictment alleges:

> On or before September 11, 2012, KHATALLAH informed others that there was an American facility in Benghazi posing as a diplomatic post, that he believed the facility was actually being used to collect intelligence, that he viewed U.S. intelligence actions in Benghazi as illegal, and that he was therefore going to do something about this facility;

*Id*. at ¶ 20(a).

## II. LEGAL FRAMEWORK

Exemption 7(A) authorizes the withholding of "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information… could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A).

The courts have long accepted that Congress intended 7(A) to apply whenever the government's case in court would be harmed by the premature release of evidence or information. Examples include the potential for witness intimidation, the revelation of the government's possible litigation strategy, and the scope of its probe.

Where a FOIA request is made by a third party seeking information to which the target of the investigation already has access, the government is required to make a more particularized showing of harm or interference with law enforcement proceedings. *See Campbell v. Department of Health and Human Services*, 682 F. 2d 256, 259, (DC Cir. 1982). The court in *Campbell* held that information to which the target of the probe already had access cannot be withheld under Exemption 7(A), because the government could not demonstrate how the documents "provided by or available to Lilly," the target of the FDA investigation, would "interfere with enforcement proceedings." *Id*.

Disclosure "could [not] reveal the direction of the investigation to Lilly or alert it to anything it does not know already." *Id*. at 260. By contrast, the decisions cited by the government "involved FOIA requests… by actual or potential targets derived from third parties and to which the requester otherwise had no access," not "a third party seeking information to which a potential target apparently has access…" *Id*. at 265. "Exemption 7(A) was meant to apply whenever the Government's case in court… would be harmed by the premature release of evidence or information not in the possession of known or potential defendants." *Id*. at 262, quoting legislative history Senator Hart's view.

Where information sought is already in targets' possession, "the government must show, by more than conclusory statements… precisely how the particular kinds of investigatory records requested would interfere with a pending enforcement proceeding." *Goldschmidt v. Dep't of Agric.*, 557 F. Supp 274, 278 (D.D.C. 1983), citing *Campbell.*

Thus, Exemption 7(A) is unavailable where the subject of the government's probe already has access to the requested information.

Here, the government may also claim that withholding is proper under Exemption 7(C), which may justify nondisclosure of law enforcement records where release "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C.A § 552(b)(7)(C).

## III. ARGUMENT

The subject of the instant motion are the FBI 302 interview reports of three of the five CIA Annex security team members—Mark Geist, Kris Paronto, and John Tiegen.[5]

In this case, the government cannot explain any harm resulting from disclosure of the FBI reports of interviews of these three witnesses. Their identities, and accounts, are known. Disclosure cannot chill prosecution because Mr. Katalla already has access to *13 Hours*.

Plaintiffs believe that the facts of stand down orders, as recounted in *13 Hours*, are related in the subject FBI 302 interview reports, and that the existence of the stand down order was discussed in the next day's video teleconference "between the FBI and other IC

---

5 *13 Hours,* <u>Ex</u> 1 at 2-3:

- Mark "Oz" Geist—At forty-six the oldest member of the team, the laid-back Oz spent a dozen years in the Marine Corps, including work in an intelligence unit, then became the police chief in the Colorado town where he grew up. After running a private investigation company, in 2004 he became a security contractor to the State Department in Iraq. Twice married, Oz had a son with his first wife and a teenage stepdaughter and an infant daughter with his second wife.

- Kris "Tanto" Paronto—former member of the Army's 75th Ranger Regiment, the voluble Tanto had a personality as colorful as the many tattoos on his muscular body. At forty-one, he'd spent a decade working as a contract security operator-a job he considered part of a battle between good and evil-in countries throughout the Middle East. Tanto held a master's degree in criminal justice, owned an insurance adjusting business, and had a son and a daughter with his second wife.

- John "Tig" Tiegen—Tig was thirty-six, a former Marine sergeant from Colorado who spent several years as a security contractor for Blackwater. He worked for the company in Afghanistan, Pakistan, and Iraq, before going to work for the CIA's Global Response Staff. Quiet and precise, the married father of infant twins, Tig was in the midst of his third trip to Benghazi for GRS, making him the team member with the most experience in the city.

officials in Washington." Disclosure will confirm or refute government misconduct and dishonesty.

The DOJ intends to rely on Exemption 7(A). On March 3, 2015, it submitted its *Unopposed Motion for an Order Preserving Certain Allegations* (ECF No. 18), seeking an order "permitting it to move for summary judgment based on the applicability of 5 U.S.C. § 552(b)(7)(A) to certain records covered by that exemption without waiving any allegation that those records are exempt from release for other reasons" (*id*. at 1), because 7(A)'s blanket coverage renders a page-by-page review for additional exemptions unnecessary, and a categorical document-by-document is more efficient. *Id*. at 5, quoting Hardy Decl., ECF No. 18-1 ¶ 26.

By April 21, 2015 letter, the government wrote plaintiffs that it also intends to claim that the information may be withheld under Exemption 7(C), 5 U.S.C.A § 552(b)(7)(C), in the absence of plaintiffs' submission of privacy waivers.[6] However, plaintiffs posit that any such privacy interest is not applicable to individuals who are engaged in significant efforts to publicize and promote their account of the matter.

---

6 April 21, 2015, letter from defense counsel:

> Plaintiffs never provided the privacy waiver documents described in FBI's March 14, 2014 letter, specifically: (1) an authorization and consent from the individuals; (2) proof of death; or (3) justification that the public interest in disclosure outweighs personal privacy. As the FBI informed you in its March 14, 2014 letter, in absence of such waivers, the FBI can neither confirm nor deny the existence of any 302 Interview Reports from any alleged interviews of John Tiegen, Kris Paronto, or Mark Geist.
>
> In any event, even if Plaintiffs had provided the requisite privacy waiver documents for these three individuals, the FBI continues to assert that any 302 Interview Reports for alleged interviews of John Tiegen, Kris Paronto, or Mark Geist, would be exempt from disclosure under FOIA Exemption 7(A), 5 U.S.C. § 552(b).

The government prosecuting at least one attacker, whereas the targets of plaintiffs' probe are U.S. government officials. Disclosure will further plaintiffs' probe, while the DOJ would suffer no adverse consequences.

CONCLUSION

Plaintiffs are entitled to disclosure of all nonexempt, segregable, portions of the FBI 302 interview reports of Mark Geist, Kris Paronto, and John Tiegen.

Date: May 13, 2015.

Respectfully submitted,

/s/

John H. Clarke Bar No. 388599
Attorney for plaintiffs
1629 K Street, NW
Suite 300
Washington, DC 20006
(202) 344-0776
johnhclarke@earthlink.net

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| ACCURACY IN MEDIA, INC., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 14-1589 (EGS) |
| DEPARTMENT OF DEFENSE, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFFS' STATEMENT OF MATERIAL FACT**

In support of their Motion for Partial Summary Judgment against Defendant Department of Justice on the Issue of Disclosure of Three FBI Interview Reports, under Rule 56 of the Federal Rules of Civil Procedure, and Local Civil Rule 7(h), plaintiffs respectfully submits this Statement of Material Fact to which there is no Genuine Issue.

---

1. On February 21, 2014, plaintiffs made a FOIA request to the FBI, for disclosure of accounts of witnesses to the September 11 and 12, 2012 attacks, in Benghazi, Libya, including reports of FBI interviews conducted in Germany:

> All records generated between September 11, 2012 and the present, by survivors of the September 11th and 12th attacks on the Benghazi mission and the Benghazi CIA Annex, or by any person regarding the survivors' accounts of the attack.
>
> September 15th or 16th FBI 302 Interview Reports, and corresponding handwritten notes, of interviews conducted in Germany of United States personnel who had been in the Benghazi mission and the Benghazi CIA annex during the September 11th and 12th attacks on those facilities.

(*See* Supp. Compl., ECF No. 12, ¶ 126 at 51.)

2. On February 21, 2014, plaintiffs made a FOIA request to the FBI, for disclosure of a September 16, 2012 video teleconference between the FBI and other IC officials in Washington:

> Records of the video teleconference on the afternoon of the September 16th, 2012, between the FBI and other IC officials in Washington, regarding FBI interviews with U.S. personnel who had been on the compounds in Benghazi during the attack. For your reference, the following is an excerpt from the December 30, 2012, Senate Committee On Homeland Security And Governmental Affairs, 'Flashing Red: A Special Report On The Terrorist Attack At Benghazi:
>
>> On September 15th and 16th, officials from the FBI conducted face-to-face interviews in Germany of the U.S. personnel who had been on the compound in Benghazi during the attack. The U.S. personnel who were interviewed saw no indications that there had been a protest prior to the attack. Information from those interviews was shared on a secure video teleconference on the afternoon of the 16th with FBI and other IC officials in Washington; it is unclear whether the question of whether a protest took place was discussed during this video conference.

(*See* Supp. Compl., ECF No. 12, ¶ 126 at 51.)

3. In September of 2014, Hatchette Book Group published "*13 Hours*, *The Inside Account of what Really Happened in Benghazi,*" by "Mitchell Zuckoff with the Annex Security Team." (*See* <u>Ex 1</u> at 4.)

4. The "main sources of the book are the five surviving American security force contractors, known as 'operators.'" (*See* <u>Ex 1</u> at 5.)

5. All dialogue appearing in the book was related firsthand. (*See* <u>Ex 1</u> at 5.)

6. The following passages are accurately excerpted from *13 Hours*, *The Inside Account of what Really Happened in Benghazi*:

> Standing outside the Mercedes, Tig called out, "Hey, we gotta go now! We're losing the initiative!" "No, stand down, you need to wait," Bob the base chief yelled back. "We need to come up with a plan," the Team Leader repeated.
>
> In the meantime, Tanto told the bosses, he and the other operators were overdue to move out. The CIA chief looked at Tanto, then at the Team Leader, then back to Tanto. Tanto felt as though the chief was looking right through him. "No," Bob said, "hold up. We're going to have the local militia handle it." Tanto couldn't believe his ears. He turned to the Team Leader: "Hey, we need to go." "No," the T.L. said, "we need to wait. The chief is trying

> to coordinate with 17 Feb and let them handle it." "What do you mean, 'Let them handle it?'" Tanto demanded.
>
> "We're being attacked!" one yelled, his voice tight with stress. "There's approximately twenty to thirty armed men, with AKs firing. We're being attacked! We need help! We need help now!" Adrenaline surged through the operators' veins, but again they were told to wait. They were used to following orders, and they knew that insubordination could mean their jobs or worse. But a shared thought took hold in both vehicles: If they weren't given permission to move out soon, they'd take matters into their own hands.

(*See* Ex 1 at 8-10.)

7. Upon the September 2014 publication of "*13 Hours*, *The Inside Account of what Really Happened in Benghazi*," three of the five Annex security team members—Mark Geist, Kris Paronto, and John Tiegen—have sought, and received, widespread publicity.

Date: May 13, 2015.

Respectfully submitted,

/s/
John H. Clarke Bar No. 388599
Attorney for plaintiffs
1629 K Street, NW
Suite 300
Washington, DC 20006
(202) 344-0776
johnhclarke@earthlink.net