**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ACCURACY IN MEDIA, INC., *et al*., | |
| Plaintiffs, | |
| v. | Civil Action No. 14-1589 EGS/DAR |
| DEPARTMENT OF DEFENSE, *et al*., | |
| Defendants. | |

**REPORT AND RECOMMENDATION**

      This case arises from a number of requests made pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, for information related to the 2012 attack on the United States Embassy in Benghazi, Libya.  *See* Am. Compl., ECF No. 31.  This action was referred to the undersigned United States Magistrate Judge for full case management. *See* 01/07/2019 Referral; *see also* 01/07/2019 Minute Order.  Pending for consideration by the undersigned are Defendants' Motion for Summary Judgment, Plaintiffs' Cross Motion for Summary Judgment, and Plaintiffs' Motion for Leave to Propound Interrogatory to the Department of Defense.  ECF Nos. 68, 71, 73.  Upon consideration of the motions, and the memoranda and attachments in support thereof and in opposition thereto, the undersigned will recommend that Defendants' Motion for Summary Judgment be granted and that Plaintiffs' Cross Motion for Summary Judgment be denied.  The undersigned will also recommend that Plaintiffs' Motion for Leave to Propound Interrogatory to the Department of Defense be denied.

Accuracy in Media, Inc. et al. v. Department of Defense, et al.

## I.    BACKGROUND

This case involves more than 40 FOIA requests related to the 2012 attack on the United States Embassy in Benghazi, Libya.  Plaintiffs, Accuracy in Media, Inc., and seven individuals,[1] directed these requests towards Defendants, the United States Department of Defense ("DoD"), Department of State, Federal Bureau of Investigation ("FBI"),[2] and Central Intelligence Agency ("CIA").  *See* Am. Compl. ¶¶ 1-16.

Plaintiffs allege that Defendants failed to conduct a reasonable search for some documents, and improperly held certain responsive documents.  Pls.' Opp., Cross-Mot. Summ. J., Mot. Discovery ("Pls.' Mem."), ECF No. 71.  Defendants maintain that they reasonably searched for responsive records and withheld only those records which are exempt under FOIA. Defs.' Mem. Supp. Defs.' Mot. Summ. J. ("Defs.' Mem."), ECF No. 68-2.

During the pendency of this action, the parties narrowed the number of issues in dispute.[3] The remaining issues raised in the instant motions are (1) whether the searches for responsive documents regarding initial communications and orders from DoD leadership to military components abroad conducted by the DoD were reasonable; (2) whether the DoD permissibly

---

[1] These individuals are Roger Aronoff, Captain Larry Bailey (Ret.), Lieutenant Colonel Kenneth Benway (Ret.), Colonel Richard Brauer (Ret.), Claire Lopez, Admiral James Lyons (Ret.), and Kevin Michael Shipp.  Mr. Lyons has since passed.  Joint Status Report, ECF No. 81 ¶ 1.

[2] The Department of Justice is responsible for the FBI's compliance with FOIA and is properly named as a Defendant.  The undersigned will nonetheless directly refer to the FBI herein.

[3] Therefore, though argued in the initial motions for summary judgment, the following documents are no longer in dispute: "Plaintiffs do not challenge (1) withholdings of confidential sources under Exemption 7(D), (2) information protected by privacy afforded by Exemptions 6 and 7(C), (3) the search for records responsive to the portion of plaintiffs' FOIA request to the State Department cited in ¶ 116(6) of the Second Amended Complaint, (4) whether the State Department properly withheld in full or part a call log and three interview summaries, (5) the CIA's *Glomar* assertion in response to plaintiffs' request for records of Gaddafi's expressed interest in a truce and possible abdication and exile out of Libya, (6) the CIA's search for records in response to the request for all records of CIA Director Petraeus's and Deputy Director Morell's actions and communications for the 24-hour period beginning when first notified, and (7) the DIA's withholding of four September 12, 2012, records—three intelligence reports and one situation report." Joint Status Report, ECF 81, ¶ 3. Additionally, the government has produced 54 video clips depicting the United States Consulate in Benghazi, Libya between September 10, 2012, and September 12, 2012, which resolves this initially disputed issue.  Joint Status Report, ECF No. 81 ¶ 2.

Accuracy in Media, Inc. et al. v. Department of Defense, et al.

withheld information concerning military assets available to deploy in Benghazi; (3) whether the

CIA permissibly redacted information responsive to the Plaintiffs' requests regarding the CIA

Inspector General's investigation of the Benghazi attack, and (4) whether the FBI's *Glomar*

response to requests for reports and notes of interviews the FBI allegedly conducted following

the Benghazi attack was permissible.  *See* ECF No. 65 at 3-6; Joint Status Report ¶ 3.  Plaintiffs

also moved for leave to propound an interrogatory to the DoD related to the DoD's initial orders

and communications immediately following the attack.  ECF No. 73.


## II.    APPLICABLE STANDARDS

### A.  Federal Rule of Civil Procedure 56

Summary judgment is appropriate where "there is no genuine issue as to any material fact

and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A

genuine issue of material fact is one that would change the outcome of the litigation."  *Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the

outcome of the suit under the governing law will properly preclude the entry of summary

judgment.").

Courts typically decide FOIA cases on motions for summary judgment.  *See Brayton v.*

*Office of U.S. Trade Rep.*, 641 F.3d 521, 527 (D.C. Cir. 2011).  Where the action is a challenge

to an agency's withholding of certain records, "the agency is entitled to summary judgment if no

material facts are in dispute and if it demonstrates that each document that falls within the class

requested . . . is wholly exempt from [FOIA's] disclosure requirements."  *Shapiro v. DOJ*, 34 F.

Supp. 3d 89, 94 (D.D.C. 2014).  A court may grant summary judgment based solely on

information provided in an agency's affidavits or declarations when those affidavits or

Accuracy in Media, Inc. et al. v. Department of Defense, et al.

declarations "describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009) (citation omitted); *see also Hayden v. NSA*, 608 F.2d 1381,1386-87 (D.C. Cir. 1979). "Generally, agency's justification for invoking a FOIA exemption is sufficient if it appears logical or plausible." *Shapiro v. DOJ*, 893 F.3d 796, 799 (D.C. Cir. 2018) (citation and internal quotation marks omitted).

After a party has moved for summary judgment, the nonmovant may show by affidavit or declaration that it lacks essential facts to respond in opposition to the motion. Fed. Civ. P. 56(d). If the nonmoving party makes a sufficient showing, a court may "(1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." *Id.* An affidavit or declaration offered in support of a Rule 56(d) request must meet three requirements: "(1) [I]t must outline the particular facts [the non-movant] intends to discover and describe why those facts are necessary to the litigation, (2) it must explain why [the non-movant] could not produce the facts in opposition to the motion for summary judgment, . . . and (3) it must show the information is in fact discoverable[.]" *U.S. ex rel. Folliard v. Gov't Acquisitions, Inc.*, 764 F.3d 19, 26 (D.C. Cir. 2014) (citations and internal quotation marks omitted).

### B. The Freedom of Information Act

FOIA generally provides for the disclosure of federal government records to anyone who requests them. 5 U.S.C. § 552. "Congress enacted the FOIA in order to 'pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny.'" *Morley v.*

4

Accuracy in Media, Inc. et al. v. Department of Defense, et al.

*CIA*, 508 F.3d 1108, 1114 (D.C. Cir. 2007) (quoting *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976)) (internal quotation marks omitted). Certain agency documents are exempt from FOIA requests pursuant to nine statutory exemptions, but generally, "FOIA mandates a 'strong presumption in favor of disclosure.'" *ACLU v. DOJ*, 655 F.3d 1, 5 (D.C. Cir. 2011) (quoting *Nat'l Ass'n Home Builders v. Norton*, 309 F.3d 26, 32 (D.C. Cir. 2002)). FOIA also requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt." 5 U.S.C. § 552(b). "The court has an affirmative duty to ensure that this requirement is satisfied, even if it must do so *sua sponte*." *Roseberry-Andrews v. DHS*, 299 F. Supp. 3d 9, 19 (D.D.C. 2018); *Morley*, 508 F.3d at 1123. FOIA contains nine exemptions to disclosure. 5 U.S.C. § 552. Exemptions 1, 3, and 7 are at issue here.

### 1. Exemption 1

Exemption 1 protects from disclosure any information classified "under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and . . . are in fact properly classified pursuant to such Executive order[.]" 5 U.S.C. § 522(b)(1). The current, operative Executive Order is Executive Order 13,526, which allows classification if the following conditions are met:

> (1) an original classification authority is classifying the information;
> (2) the information is owned by, produced by or for, or is under the control of the United States Government;
> (3) the information falls within one or more of the categories of information listed in section 1.4 of this order; and
> (4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, which includes defense against transnational terrorism, and the original classification authority is able to identify or describe the damage.

5

Accuracy in Media, Inc. et al. v. Department of Defense, et al.

§ 1.1(a).

Section 1.4 lists categories of classified information, including "(a) military plans, weapons systems, or operations; (b) foreign government information; (c) intelligence activities (including covert action), intelligence sources or methods, or cryptology; (d) foreign relations or foreign activities of the United States, including confidential sources; (e) scientific, technological, or economic matters relating to the national security . . . (g) vulnerabilities or capabilities of systems, installations, infrastructures, projects, plans, or protection services relating to the national security; or (h) the development, production, or use of weapons of mass destruction."

Under Exemption 1, an agency "bears the burden of proving the applicability of claimed exemptions." *Am. Civil Liberties Union v. DoD* ("*ACLU I*"), 628 F.3d 612, 619 (D.C. Cir. 2011).  In the national security context, a court "must accord substantial weight to an agency's affidavit concerning the details of the classified status of the disputed record." *Id.* (quoting *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007)).  Courts in this Circuit "have consistently deferred to executive affidavits predicting harm to the national security, and have found it unwise to undertake searching judicial review." *Ctr. for Nat. Sec. Studies v. DOJ*, 331 F.3d 918, 927 (D.C. Cir. 2003).  Accordingly, an agency will be entitled to summary judgment if the agency submits an affidavit or declaration that "describes the justifications for withholding the information with specific detail, demonstrates that the information withheld logically falls within the claimed exemption, and is not contradicted by contrary evidence in the record or by evidence of the agency's bad faith." *Id.* (citing *Larson v. Dep't of State*, 565 F.3d 857, 865 (D.C. Cir. 2009)). These justifications will be upheld if "logical or plausible." *Shapiro*, 893 F.3d at 799 (citations omitted).

6

Accuracy in Media, Inc. et al. v. Department of Defense, et al.

### 2.  Exemption 3

Exemption 3 protects from disclosure any information "specifically exempted from disclosure by statute."  5 U.S.C. § 552(b)(3).  An agency invoking Exemption 3 must meet two requirements.  *See CIA v. Sims*, 471 U.S. 159, 167-68 (1985).  First, the invoked statute must qualify as an exempting statute under Exemption 3.  *See id.*  To qualify as an exempting statute under Exemption 3, a statute must be one which "(i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or (ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld."  5 U.S.C. § 552(b)(3)(A).  Second, the withheld material must be the kind of material covered by the statute. *See Sims*, 471 U.S. at 167-68.

### 3.  Exemption 7

Exemption 7 protects from disclosure certain records "compiled for law enforcement purposes."  5 U.S.C. § 552(b)(7).  In determining the threshold question of whether the records were compiled for law enforcement purposes, the "focus is on how and under what circumstances the requested files were compiled, and whether the files sought relate to anything that can fairly be characterized as an enforcement proceeding."  *Jefferson v. DOJ*, 284 F.3d 172, 176-77 (D.C. Cir. 2002) (citations and internal quotations omitted).  If an agency satisfies that threshold question, the agency must demonstrate that a subsection of Exemption 7 applies.

Exemption 7(A) protects records which "could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A).  Under 7(A), an agency must "show that the material withheld 'relates to a concrete prospective law enforcement proceeding.'"  *Juarez v.*

Accuracy in Media, Inc. et al. v. Department of Defense, et al.

*DOJ*, 518 F.3d 54, 58 (D.C. Cir. 2008) (quoting *King v. DOJ*, 830 F.2d 210, 217 (D.C. Cir. 1987).

Exemption 7(D) protects records compiled for law enforcement purposes if release of the records "could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis." 5 U.S.C. § 552(b)(7)(D). This exemption applies to both the identity and identifying information of a confidential source in addition to information from a confidential source. *See Roth v. DOJ*, 642 F.3d 1161, 1185 (D.C. Cir. 2011). An agency invoking Exemption 7(D) must demonstrate that a source, in either express or implied terms, expected confidentiality. *See id.* at 1184.

## III.     MOTIONS FOR SUMMARY JUDGMENT

Considering each Defendant in turn, the undersigned concludes that Defendants acted consistently with FOIA's requirements. Specifically, the undersigned finds that (1) the DoD conducted an adequate search and properly withheld records of available military assets pursuant to Exemption 1; (2) the CIA properly redacted CIA Inspector General files pursuant to Exemptions 1, 3, 6, and 7, and (3) the FBI properly issued a *Glomar* response after receiving a request for witness interview reports of U.S. personnel following the Benghazi attack pursuant to Exemption 7(A).

### A.  The Department of Defense Conducted an Adequate Search for Records and Properly Withheld Records Related to Military Assets

### 1.  The Department of Defense Conducted an Adequate Search

Accuracy in Media, Inc. et al. v. Department of Defense, et al.

An agency that has received a FOIA request must "conduct a search reasonably calculated to uncover all relevant documents." *Truitt v. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990) (quoting *Weisberg v. DOJ*, 705 F.2d 1344, 1351 (D.C. Cir. 1983)) (noting that the actual recovery of every existing document is not significant; the relevant issue is "whether the government's search for responsive documents was adequate").  An adequate search is one that is reasonable, and the agency must demonstrate that its search was reasonable "beyond material doubt." *Id.*  For a court to grant an agency's motion for summary judgment, "the agency must show that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Oglesby v. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990) (holding that the agency is not required to search every record system, but must search the systems "likely to turn up the information requested"). "There is no requirement that an agency search every record system[;]" however, an agency is required to "explain in its affidavit that no other record system was likely to produce responsive documents." *Id.*  To meet this standard, an agency can produce "[a] reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched." *Reporters Comm. for Freedom of Press v. FBI*, 877 F.3d 399, 402 (D.C. Cir. 2017) (quoting *Oglesby*, 920 F.2d at 68).  An agency meeting this burden is "accorded a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (citation and quotation marks omitted).

The DoD is entitled to such a presumption because it submitted a "reasonably detailed" declaration from Mark Herrington, the Associate Deputy General Counsel in the DoD Office of

Accuracy in Media, Inc. et al. v. Department of Defense, et al.

General Counsel, explaining how the searches for responsive records were conducted. *Id.*; *see* Herrington Decl., ECF No. 68-4.  As is relevant for the instant motions, Mr. Herrington details how, after the Defense Intelligence Agency ("DIA"), European Command ("EUCOM"),  Navy, and Marine Corps received FOIA requests related to "[a]ll communications with, and orders to . . . personnel to get ready to deploy, and if applicable, to deploy" in the wake of the Benghazi attack, those components searched all relevant databases and offices for those records.[4]  *See id.* ¶¶ 8-15 *see also* Herrington Decl, Ex. 1, at 1 (requesting such communications and orders from the Navy).  These DoD components collectively searched Record Message Traffic databases, safes, email accounts, network shared drives, offices, sub-offices, and shared portals with, where applicable, reasonable search terms and date ranges.  *See id.*  The DoD subsequently found and partially released an Execution Order ("EXORD"), which is "the initial written order directing EUCOM to execute an action" as well as "Fragmentary Orders, which are written orders issued after the initial EXORD" and a "two-page timeline of DoD actions[.]"  *Id.* ¶¶ 17-19.

Africa Command ("AFRICOM"), in response to Plaintiffs' requests for records from March 2011 related to "Colonel Muammar Gaddafi's expressed interest in a truce and possible abdication and exile out of Libya," directed various, relevant personnel to search electronic and paper files in specific AFRICOM offices using various search terms and different spellings for "Gaddafi."  Herrington Decl. ¶¶ 25-26; Herrington Suppl. Decl., ECF No. 77-1 ¶¶ 1-13. Specifically, the search included the paper and electronic files of all AFRICOM's then-Commander, General Carter Ham, and an unsuccessful attempt to locate the files of Colonel Brian Linvill, who at one point served as the defense attaché at the United States Embassy in Tripoli, Libya.  Herrington Suppl. Decl. ¶¶ 1-13.  Ultimately, AFRICOM released some records

---

[4] Plaintiffs also requested "OPREP-3 PINNACLE report(s)" from DIA.  *See id.* ¶ 8.

Accuracy in Media, Inc. et al. v. Department of Defense, et al.

as a result of its search, but none reference the kind of truce offer that Plaintiffs believe took place. *Id*.; Pls.' Mem. at 31-32.

In an effort to overcome the presumption of good faith owed to these "reasonably detailed" declarations, Plaintiffs offer "purely speculative claims about the existence and discoverability of other documents." *Reporters Comm. for Freedom of Press*, 877 F.3d at 402 (citation omitted); *SafeCard Servs*. 926 F.2d at 1200.

### a. Plaintiffs Fail to Rebut a Presumption of Good Faith Accorded to AFRICOM's Search for Gaddafi-Related Records

Plaintiffs' concerns about AFRICOM's search have less to do with the adequacy of the search and more to do with AFRICOM's failure to produce records which would substantiate Plaintiffs' beliefs. Pls.' Mem. at 31-32 (detailing purported conversations between Libyan officials and AFRICOM). As this Circuit has repeatedly held, "the adequacy of a search is determined not by the fruits of the search, but by the appropriateness of [its] methods." *Reporters Comm. for Freedom of Press*, 877 F.3d at 408 (citations and internal quotation marks omitted). Here, the DoD explained in great detail how the search for records related to Plaintiffs' request took place. After Plaintiffs argued that the DoD's declaration was insufficient, the DoD filed a supplemental declaration addressing some of those issues, which Plaintiffs do not appear to dispute. *Compare, e.g.*, Pls.' Mem. at 31-33 (stating that the DoD did not "relate whether it searched General Carter Ham's records") *with* Herrington Suppl. Decl. ¶ 11 (affirming that General Ham's records were searched); *see generally* Pls.' Reply, ECF No. 80 (declining to dispute the supplemental declaration).

Plaintiffs offer an affidavit which includes the affiant's belief about Gaddafi's willingness to negotiate a truce, as well as certain conversations and actions that occurred within

11

Accuracy in Media, Inc. et al. v. Department of Defense, et al.

AFRICOM.  Pls.' Mem. at 31-33.  Even if the undersigned took everything in this affidavit as true,[5] Plaintiffs still do not call into question the DoD's "methods" but instead state disbelief at the "fruits of the search[.]"  *Reporters Comm. for Freedom of Press*, 877 F.3d at 408 (citations omitted).  This affidavit is therefore insufficient to overcome a presumption of good faith here.[6]

The undersigned can find only one issue that Plaintiffs raise about the methods of the DoD's search that was not addressed in the DoD's supplemental declaration—the DoD's failure to use the search term "CIA."  Pls.' Mem. at 32.  One extra search term may have produced more responsive records, but this contention is "speculative."  *SafeCard Servs.*, 926 F.2d at 1200.  While Plaintiffs believe that the CIA was involved in a truce negotiation attempt, it stands to reason that a search involving the terms "Gaddafi" and the others that the DoD used would "turn up" those records.  Herrington Decl. ¶ 26; Herrington Suppl. Decl. ¶ 13; *Oglesby*, 920 F.2d at 68.  The undersigned therefore recommends granting Defendants' motion as it relates to the adequacy of the DoD's search for these records.

### b.  Congressional Testimony Does Not Rebut the Presumption of Good Faith

---

[5] Defendants submit that these affidavits do not conform with Rule 56(c) and therefore should be stricken at least in part.  The undersigned does not need to reach this question, however, because, if fully credited and based on personal knowledge, these affidavits offer no real material facts tending to undercut the reasonableness of DoD's search.  *See* Kubic. Aff., ECF No. 71-3 ¶¶ 3-9 (stating only that the affiant had several conversations, not that any records were created).  In the alternative, the undersigned would recommend striking paragraphs three through nine because the affiant relies on hearsay, states facts that are not based on the affiant's personal knowledge, and provides information that is not relevant.  *See id.*; *Hall v. CIA*, 538 F. Supp. 2d 64, 72 (D.D.C. 2008) (granting motion to strike paragraphs of certain affidavits because the statements were conclusory and contained no foundation).  As explained later in this Report and Recommendation, the affidavit of retired Admiral James Lyons also has no impact on the court's weighing of the material facts here because he merely states his opinion, instead of any facts, about current national security risks.  *See* Lyons Aff., ECF No. 71-2 ¶ 2 ("The sole purpose of this affidavit is to set forth my opinion . . . ."); *Waldie v. Schlesinger*, 509 F.2d 508, 510 (D.C. Cir. 1974) (holding that a court may not rely on affidavits consisting of "conclusory opinions" in summary judgment context).  In the alternative, the undersigned recommends striking Admiral Lyons' opinions because they are not based on personal knowledge and are not relevant.  Lyons Aff. ¶¶ 2-5.

[6] For the same reason, the existence or non-existence of a "PINNACLE OPREP-3" Report, a version of which was actually released to Plaintiff, is beside the point and does not overcome a presumption of good faith here.  *See* Pls.' Mem. at 30-31.

Accuracy in Media, Inc. et al. v. Department of Defense, et al.

Plaintiffs also challenge the adequacy of the DoD's search for responsive documents related to initial orders and communications from DoD leadership to DoD components abroad following the attack because "the DoD's unequivocal position is that the records do not exist, even while it has a history of unequivocally representing to Congress, and to the public, that the records do exist." Pls.' Mem. at 4.  In reviewing the testimony, the undersigned does not find grounds to overcome the presumption of good faith accorded to the DoD.

Former Secretary of Defense, Leon Panetta, testified before a House Select Committee that he received word of the attack in Benghazi around 4:32 pm EST on September 11, 2012. *See* Clarke Decl., ECF No. 71-1, Ex. 3 ("Panetta Test.") at 12.  After speaking to President Obama in the Oval Office and returning to the Pentagon for further informational meetings, Secretary Panetta issued orders to "not only prepare to deploy but deploy." *See id*. at 15. He testified that these orders were verbal and later released in the written EXORD, the first written order, at 3:00 am. *Id*. 15-16.  Defendants released the EXORD record as well as a timeline of all communications following the initial knowledge of the attack. *See* Herrington Decl. ¶ 18.

Plaintiffs insist that there must have been earlier written orders and communications, but this contention is speculative.  Secretary Panetta conveyed his initial orders verbally, and it appears likely that he did not immediately reduce them to written form. *See* Panetta Test. at 12. Any gap in time between these verbal orders and the creation of the EXORD record that the DoD released may have simply been the result of administrative delay.  *See id*. at 45 ("[M]y view was, "Go," and I assumed that they were moving as expeditiously as they could."); *see also* Clarke Decl., Ex. 4 ("Select Committee Report") at 56 ("During those crucial hours between the Secretary's order and the actual movement of forces, no one stood watch to steer the Defense Department's bureaucratic behemoth forward to ensure the Secretary's orders were carried out

Accuracy in Media, Inc. et al. v. Department of Defense, et al.

with the urgency demanded by the lives at stake in Benghazi.").  Secretary Panetta's testimony and the timeline of communications provided by the DoD to Plaintiffs all support the idea that no written records or communications were created prior to the 3:00 a.m. EXORD. *See* Herrington Decl. ¶ 18. ("This EXORD that EUCOM produced to Plaintiffs is the first written order."); *see* Clarke Decl., Ex. 1 at 3 (explaining that at approximately 6:00 p.m. to 8:00 p.m. "Secretary Panetta directs (provides verbal authorization) for the following actions: [to direct forces and assets to prepare to deploy]" and that the EXORD was issued at approximately 3:00 a.m.).

Plaintiffs' main contention is that this official timeline of events is doubtful; however, the undersigned finds that this contention is of little significance. *See, e.g.*, Pls.' Mem. at 14 (expressing skepticism that Secretary Panetta could have travelled from a meeting in the White House to the Pentagon in 30 minutes).  Plaintiffs must instead point to concrete evidence of the existence of particular records that the DoD failed to produce. *See SafeCard Servs.*, 926 F.2d at 1200.  Setting aside Plaintiffs' argument that the DoD's timeline is inaccurate, the undersigned can only find two allegations of specific, actual records which, according to Plaintiffs, must exist.[7] *See* Pls.' Mem. at 6-7 (referencing an "Ops Alert" and a record of a conference call). Even if there were an "Ops Alert" from the State Department in writing and in the DoD's possession,[8] Plaintiffs do not show how this record would be responsive to Plaintiffs' request for "communications with, and orders to . . . personnel to get ready to deploy, and if applicable, to deploy" if the record is an inter-agency communication describing the attack rather than a communication with personnel about deployment. *See* Herrington Decl, Ex. 1, at 1.  Plaintiffs'

---

[7] Plaintiffs allege certain other orders and communications but, even if they existed in some sense, Plaintiffs do not point to evidence of records that would exist in the physical possession of the DoD. *See e.g.*, Pls.' Mem. at 30-32 (alleging stand down orders that were relayed over the phone).

[8] To be clear, Plaintiffs do not specifically allege, and the record does not establish, that the Ops Alert was in writing and in DoD's possession.

14

Accuracy in Media, Inc. et al. v. Department of Defense, et al.

allegation of a record from a conference call fares little better because Plaintiffs do not point to any concrete evidence suggesting that a record memorializing the call was created.  Thus, assertions that these records exist amount to "purely speculative claims about the existence and discoverability of other documents."  *SafeCard Servs*. 926 F.2d at 1200.

Moreover, even if some records of earlier initial orders or communications exist, there is no evidence that the DoD failed to search for them in good faith.  *See* Herrington Decl. ¶ 18; *see* Pls.' Mem. at 4 (noting that "plaintiffs are not in a position to dispute the particulars of the DoD's search").  FOIA requires only that agencies reasonably search for responsive records, but "[a]n agency's 'failure to turn up a particular document or mere speculation that as yet uncovered documents might exist,' . . . does not undermine the determination that the agency conducted an adequate search for the requested records.'"  *Bigwood v. DoD*, 132 F. Supp. 3d 124, 143 (D.D.C. 2015) (citation omitted).  Thus, the undersigned finds that the DoD's search was reasonable and therefore adequate.


### 2.  The DoD Properly Withheld Records Related to Military Assets Pursuant to Exemption 1

Plaintiffs challenge the DoD's decision to withhold records of DoD assets that were available to deploy to Benghazi.  In the course of the parties' briefing, Plaintiffs narrowed their challenge to the DoD's withholding of "[m]aps depicting all assets that could have been dispatched to the Benghazi mission or the CIA annex facility on September 11th and 12th, 2012[.]"  *See* Defs.' Mem. at 2; Pls.' Mem. at 2 n.7, 27-28 (citation omitted).  These maps include "the numbers and locations of ships, submarines, response forces, and aircraft surrounding Benghazi, Libya" as well the "numbers of military personnel located in particular countries during that time" and "the transit time required for each available asset to reach

Accuracy in Media, Inc. et al. v. Department of Defense, et al.

Benghazi." Malloy Decl., ECF No. 69-1 ¶ 9. The DoD explains that this information remains

classified at the "Secret" level because, "[e]ven with the passage of time, how the DoD's forces

are positioned at a particular time could provide potentially damaging and/or threatening insight

to adversaries." *Id.* ¶ 11. The DoD classified the maps pursuant to Sections 1.4(a), 1.4(d), and

1.4(g) of Executive Order 13,526 because the information in the maps includes "military

operations conducted overseas, describes foreign activities of the United States, and provides

transit times and a list of assets that demonstrate the capabilities of the DoD's plans and

infrastructure. *Id.* ¶ 10.

The undersigned must give this explanation "substantial weight." *ACLU I*, 628 F.3d at

619 (citation omitted). In doing so, the undersigned finds that the application of Exemption 1 to

these maps is both "logical" and "plausible." *Shapiro*, 893 F.3d at 799 (citation omitted). There

is no reason to doubt that past maps of military assets "could provide potentially damaging

and/or threatening insight to adversaries regarding the DoD's interests, intent, and potential

operations in these volatile regions of the world." Malloy Decl, ¶ 11. In the national security

context, where courts "lack the expertise necessary to second-guess such agency opinions[,]"

"searching judicial review" of this potential future harm is inappropriate. *ACLU I*, 628 F.3d at

619 (citation omitted); *Ctr. for Nat. Sec. Studies*, 331 F.3d at 927.

Plaintiffs' argument that these maps should no longer be classified is unavailing. Relying

an affidavit from retired Admiral Lyons, Plaintiffs argue that information about military assets in

2012 no longer poses national security concerns because the location and number of military

assets have changed since then. *See* Pls.' Mem. at 27-30. However, the Lyons Affidavit fails to

create a genuine dispute of material fact regarding whether these maps fall under Exemption 1.

Admiral Lyons was retired for several years prior to submitting his affidavit, so his opinion about

Accuracy in Media, Inc. et al. v. Department of Defense, et al.

the nature of current or future military assets is limited at best. *See* Lyons Aff., ECF No. 71-2 ¶ 1. As Admiral Lyons effectively acknowledged, he offered an "opinion" based on his experience, but this opinion is not based on personal knowledge of these records or the present risks to the military, so the undersigned accords these opinions little weight.[9] *See id.* ¶ 2 ("The sole purpose of this affidavit is to set forth my opinion . . . ."); *Waldie*, 509 F.2d at 510 (holding that a court may not rely on affidavits consisting of "conclusory opinions" in summary judgment context).

Plaintiffs' argument that these maps should not be confidential because some information is in the public domain fares little better. Pls.' Mem. at 29-30 (referencing some, limited public information about aircraft in Europe). This Circuit "has repeatedly rejected the argument that the government's decision to disclose some information prevents the government from withholding other information about the same subject." *ACLU I*, 628 F.3d at 625. Plaintiffs do not attempt to demonstrate, as this Circuit requires under these circumstances, that the following criteria is satisfied: "(1) the information requested must be as specific as the information previously released; (2) the information requested must match the information previously disclosed; and (3) the information requested must already have been made public through an official and documented disclosure." *Id.* at 620-21 (citations omitted). In any event, as Plaintiffs point out, the DoD has steadfastly resisted release of this information, so the third prong of this test cannot be satisfied. *See* Pls.' Mem. at 29-30 (noting that the DoD did not cooperate with the Select Committee in its requests for information about available military assets). Thus, the undersigned recommends granting Defendants' motion with respect to the DoD.[10]

---

[9] As previously discussed, the undersigned alternatively recommends striking this declaration instead of according it little weight.

[10] While Plaintiffs do not challenge the DoD's segregability analysis, the undersigned has "an affirmative duty to ensure that this requirement is satisfied, even if it must do so *sua sponte*." *Roseberry-Andrews*, 299 F. Supp. 3d at

Accuracy in Media, Inc. et al. v. Department of Defense, et al.

### B.  The CIA Properly Withheld CIA Inspector General Files

 Plaintiffs challenge the CIA's redaction of records related to a complaint sent to the CIA

Inspector General David Buckley ("IG") following the Benghazi attack. The CIA has released 25

redacted pages of responsive records (the "IG Files") about the complaint, starting with an email

to the CIA IG stating that "the CIA has not been provided fulsome details regarding" the

Benghazi attack.  *See* Clarke Decl., Ex. 8 ("IG Files") at 82.  These records also include an email

from the IG to other CIA personnel summarizing some of the information, which was "second

and third hand[,]" and an interview report.  *Id.* at 85-94.

The CIA contends these redactions were proper pursuant to Exemptions 1, 3, 6, and 7,

and that it has disclosed all other reasonably segregable portions of the IG Files to Plaintiffs. *See*

Shiner Decl., ECF 68-5 ¶ 1.  Plaintiffs emphasize that they do not seek identifying information of

any CIA personnel, but instead seek the "specific subject matter" underling the complaints,

which, according to Plaintiffs, the CIA is required to provide by law.  Pls.' Mem. at  37.

Plaintiffs' main contention fails on multiple fronts.  The law which Plaintiffs cite as

imposing this requirement[11] applies to "operational files," a status that the CIA has never

asserted for the records in question.  50 U.S.C. § 3141(c)(3); *see* Shiner Suppl. Decl., ECF No.

77-2 ¶¶ 4-5.  Further, to the extent that FOIA broadly imposes an obligation to produce non-

exempt portions of records like the subject matter of a record, the subject matter of these records

is apparent from the face of them.  These records reveal a complaint to the CIA IG concerning an

---

19. The undersigned finds that the DoD has fulfilled this requirement because of the classified nature of the map and the fact that a map is not as readily segregable as other kinds of records.  *See also* Malloy Decl. ¶ 12 (affirming that the DoD reviewed the maps for segregable, non-exempt information).

[11] Plaintiffs cite 50 U.S.C. § 431, which has since been re-codified at 50 U.S.C. § 3141.

Accuracy in Media, Inc. et al. v. Department of Defense, et al.

individual's belief that the CIA did not have accurate and full information about the Benghazi

attack.  Plaintiffs, by their own admission, instead seek the "details" of the IG Files which, as the

undersigned will now explain, are protected from disclosure by Exemptions 1, 3, and 7.  *See* Pls.'

Reply at 3-4 ("What 'fulsome details' had Director Petraeus not been told?").


### 1.   The CIA Properly Withheld Portions of the IG Files Pursuant to Exemption 1

The CIA has adequately demonstrated that some information in the IG Files is protected

pursuant to Exemption 1 because the CIA has proffered "a plausible assertion that information is

properly classified."  *Morley*, 508 F.3d at 1124.  The CIA has offered the affidavit of its

Information Review Officer, Antoinette B. Shiner, which includes the explanation that Section

1.1(a) of Executive Order 13,526 is satisfied because Ms. Shiner is qualified to classify

information, the information is owned and controlled by the federal government, and that Section

1.4(c) of Executive Order 13,526 is satisfied because the "Secret" information concerns

"intelligence activities (including covert action), [or] intelligence sources or methods," which

"could reasonably be expected to result in serious damage to the national security" should the

information be released.  Shiner Decl. ¶ 34.  Specifically, the redacted information contains

"code words, locations, names of covert personnel, as well as references to classified Agency

programs, functions, assets, and activities unrelated to the September 2012 attacks."  *Id*. ¶ 35.

Such disclosure can "permit foreign intelligence services and other groups to fit disparate pieces

of information together to discern or deduce the identity of the source or nature of the project or

location for which the code word stands," thereby injuring national security interests.  *Id.* ¶ 37.

The undersigned finds that the CIA has "describe[d] the justifications for withholding the

information with specific detail [and] demonstrate[d] that the information withheld logically falls

Accuracy in Media, Inc. et al. v. Department of Defense, et al.

within the claimed exemption[.]"  *Ctr. for Nat. Sec. Studies*, 331 F.3d at 927 (citation omitted).

Moreover, Plaintiffs point to no "evidence in the record or . . . evidence of the agency's bad

faith."  *Id.*  Thus, while Plaintiffs assert that the substance of the IG Files cannot be protected

under FOIA, the undersigned finds that, to the extent the CIA withheld substantive information

concerning "programs, functions, assets, and activities[,]" such information is classified and

protected under Exemption 1.  Pls.' Mem. at 37; Shiner Decl. ¶ 35.  The undersigned therefore

recommends granting Defendants' motion as it relates to the CIA's Exemption 1 withholdings.


### 2.   The CIA Properly Withheld Identifying Information and Code Words Pursuant to Exemption 3

Plaintiffs agree with Defendants that disclosure of identifying information of CIA

personnel would damage national security.  Pls.' Mem. at 37.  Additionally, Plaintiffs no longer

dispute "privacy"-related withholdings pursuant to Exemption 6.  Joint Status Report, ECF No.

81 ¶ 2.  The extent to which Plaintiffs concede the similar applicability of Exemption 3 is

unclear.  Nonetheless, in fully reviewing the CIA's withholdings pursuant to Exemption 3, the

undersigned finds that the CIA offers plausible explanations.

To support its withholdings under Exemption 3, the CIA must first point to a statute

which "(i) requires that the matters be withheld from the public in such a manner as to leave no

discretion on the issue; or (ii) establishes particular criteria for withholding or refers to particular

types of matters to be withheld."  *Id.* § 552(b)(3)(A); *Sims*, 471 U.S. at 167-68.  The CIA asserts

that two such statues apply: Section 6 of the Central Intelligence Agency Act of 1949 (the "CIA

Act") and Section 102A(i)(1) of the National Security Act of 1947. Shiner Decl. ¶¶ 41, 43.  The

undersigned finds, and Plaintiffs do not dispute, that these are exempting statutes under

Accuracy in Media, Inc. et al. v. Department of Defense, et al.

Exemption 3. *See, e.g.*, *Halperin v. CIA*, 629 F.2d 144, 147 (D.C. Cir. 1980) (noting that this

Circuit has "consistently held" that both are exempting statutes which the CIA can invoke).

Section 6 of the CIA Act, 50 U.S.C. § 3507, provides that the CIA shall be exempt from

the provisions of "any other law which require the publication or disclosure of the organization,

functions, names, official titles, salaries, or numbers of personnel employed by the Agency." 50

U.S.C. §3507. Thus, "[t]he CIA Act does not protect *all* information about CIA functions

generally; it more narrowly protects information that would reveal that a given function is

one "of personnel employed by the Agency." *Nat'l Sec. Counselors v. CIA* ("*Nat'l Sec.*

*Counselors II*"), 960 F. Supp. 2d 101, 179-80 (D.D.C. 2013). Here, the undersigned is satisfied

that the CIA's withholdings comport with the narrow scope of the CIA Act because, pursuant to

this law, the CIA has only withheld "information concerning the organization, names, or official

titles of personnel employed by the CIA[.]" Shiner Decl. ¶ 41.

Under the National Security Act, the Director of National Intelligence "shall protect

intelligence sources and methods from unauthorized disclosure." 50 U.S.C. § 3024(i)(1). Courts

in this Circuit construe this provision broadly to protect information that "*relates* to intelligence

sources and methods" and information which "can reasonably be expected to lead to

unauthorized disclosure of intelligence sources and methods." *Leopold v. Cent. Intelligence*

*Agency*, 380 F. Supp. 3d 14, 28 (D.D.C. 2019) ("*Leopold II*") (citations and internal quotation

marks omitted). This provision grants the CIA "very broad authority to protect all sources of

intelligence information from disclosure." *Sims*, 471 U.S. at 168-69.  It is a "near-blanket FOIA

exemption" which covers public and non-public information because "bits and pieces of data

may aid in piecing together bits of other information even when the individual piece is not of

obvious importance in itself." *Leopold v. Cent. Intelligence Agency*, 106 F. Supp. 3d 51, 57-58

Accuracy in Media, Inc. et al. v. Department of Defense, et al.

(D.D.C. 2015) ("*Leopold I*") (citing *Whalen v. U.S. Marine Corps*, 407 F. Supp. 2d 54, 59 n. 5

(D.D.C. 2005).  The CIA has invoked the National Security Act to protect the same "code words

and names of covert personnel" for which the CIA has also invoked Exemption 1.  Shiner Decl. ¶

44.  This information easily qualifies as "intelligence sources and methods" under the National

Security Act.  50 U.S.C. § 3024(i)(1).  Thus, the undersigned recommends granting Defendants'

motion as it relates to the CIA's withholdings pursuant to Exemption 3.


### 3.  The CIA Properly Invoked Exemption 7 to Protect the Substance of the IG Files

Exemption 7(D) authorizes the withholding of information compiled for law enforcement

purposes if release of the information "could reasonably be expected to disclose the identity of a

confidential source, including a State, local, or foreign agency or authority or any private

institution which furnished information on a confidential basis."  5 U.S.C. § 552(b)(7)(D).  Here,

this exemption applies to both the identity and identifying information of the confidential source

in addition to information from the confidential source.  *See Roth*, 642 F.3d at 1185.  The

information here relates to "an investigation pertaining to the September 2012 attacks in

Benghazi, Libya."  Shiner Decl. ¶ 54.  The source was a "confidential source" because the CIA

offered explicit or implicit assurances that his or her identity would not be revealed.  *See id*.;

*Roth*, 642 F.3d at 1184.  The underlying subject matter of the initial complaint would tend to

provide enough information to reveal the identification of the reporting individual, which is why

the CIA has a policy of refusing to disclose both identification of the individual and the

substance of their statements. *See id.*  Thus, not only is the identification of the source of the

complaint to the IG protected, the information provided is also covered by Exemption 7(D)

because the information would tend to reveal a confidential source's identity.  The undersigned

Accuracy in Media, Inc. et al. v. Department of Defense, et al.

recommends granting Defendants' motion as it related to the CIA's withholdings pursuant to Exemption 7(D).[12]

### C.  The FBI Fails to Adequately Explain its "*Glomar* Response" But Has Not Officially Acknowledged Witness Interview Reports

Through a "*Glomar* response," an agency "neither confirms nor denies the existence of the requested records." *Roth*, 642 F.3d at 1171.  FOIA typically requires that an agency "acknowledge the existence of information responsive to a FOIA request and provide specific, non-conclusory justifications for withholding that information[.]" *Id.* at 1178 (citation omitted).  A *Glomar* response is allowed only if "confirming or denying the existence of records would itself cause harm cognizable under an FOIA exception[.]" *Id.* (citation and internal quotation marks omitted).  A party can challenge a *Glomar* response either by challenging the agency's contention that "confirming or denying the existence of records would cause harm under the FOIA exception invoked by the agency[,]" or by demonstrating that the agency has already "officially acknowledged the existence of the record[.]" *James Madison Project v. DOJ*, 302 F. Supp. 3d 12, 20 (D.D.C. 2018) (citation omitted); *Moore v. CIA*, 666 F.3d 1330, 1333 (D.C. Cir. 2011) (citation omitted).

At issue here is the FBI's response that, pursuant to Exemption 7(A), the FBI will neither confirm or nor deny the existence of responsive records regarding certain witness interview reports that Plaintiffs allege were created during witness interviews of United States personnel in Germany following the Benghazi attack.  Hardy Decl., ECF No. 68-7 ¶¶ 13-16.  These reports,

---

[12] Beyond asserting that the substance of the IG Files is subject to disclosure, Plaintiffs do not otherwise challenge the CIA's segregability analysis.  Nonetheless, the undersigned has "an affirmative duty to ensure that this requirement is satisfied, even if it must do so *sua sponte*." *Roseberry-Andrews*, 299 F. Supp. 3d at 19.  In reviewing the IG Files, the undersigned finds that the CIA has partially released all reasonably segregable information. *See also* Shiner Decl. ¶ 49 (affirming that the CIA reviewed the IG Files for segregable, non-exempt information).

Accuracy in Media, Inc. et al. v. Department of Defense, et al.

known as "FD-302s" or 302 reports, are forms used by FBI agents "to record information which they obtain through witness interviews, . . . grand jury subpoenas, proffer agreements and immunity statements, and from other federal agencies." *Citizens for Resp. and Ethics in Wash. v. DOJ*, 746 F.3d 1082, 1089 (D.C. Cir. 2014).  The FBI explains that it is "actively investigating the Benghazi attacks" and that confirming or denying the existence of these records "undermines the integrity of the ongoing investigations."  Hardy Decl. ¶¶ 13-16.  Thus, according to the FBI, confirming or denying the existence of these records "could reasonably be expected to interfere with enforcement proceedings."  5 U.S.C. § 552(b)(7)(A).

Plaintiffs do not contest that these 302 reports would be compiled for a law enforcement purpose, and that the enforcement proceedings are ongoing.  Plaintiffs challenge this *Glomar* response by arguing that witness accounts are already public and that the targets of any investigation already have the information within the 302 reports.  Pls.' Mem. at 42-45.  It is unclear whether Plaintiffs assert that the FBI's acknowledgement or denial would not "cause harm under the FOIA exception invoked by the agency" or that the FBI has already "officially acknowledged the existence of the record[.]"  *James Madison Project*, 302 F. Supp. 3d at 20 (citation omitted); *Moore*, 666 F.3d at 1333 (citation omitted).  Regardless, "the burden is on the agency to sustain its action," so the undersigned must determine whether the FBI's explanation of its *Glomar* response is "logical or plausible."  *Am. Civil Liberties Union v. CIA*, ("*ACLU II*") 710 F.3d 422, 427 (D.C. Cir. 2013) (citations and internal quotation marks omitted).

1.   **While the FBI Explains Harms That Would Result from the Disclosure of 302 Reports, the FBI Fails to Explain Harms That Would Result From Not Issuing a** *Glomar* **Response**

Accuracy in Media, Inc. et al. v. Department of Defense, et al.

The FBI offers reasonably detailed potential harms that would result from disclosing any substance associated with the 302 reports. Specifically, a witness or survivor may face retaliation or harassment if a witness has or has not cooperated with the FBI. Hardy Decl. ¶ 16. Moreover, disclosure of any information related to the "direction, scope, pace, particular witness statements and focus of the investigations" would harm "the integrity of the ongoing investigations." *Id.* ¶ 15. To be sure, these are harms that are recognized under Exemption 7(A). *Manning v. DOJ*, 234 F. Supp. 3d 26, 36 (D.D.C. 2017) (holding that such harms are covered under Exemption 7(A)); *see also Tipograph v. DOJ*, 83 F. Supp. 3d 234, 239 (D.D.C. 2015) (holding that the 7(A) exemption protects against "destruction of evidence, chilling and intimidation of witnesses, and revelation of the scope and nature of the Government's investigation).

It does not necessarily follow, however, that "confirming or denying the existence of records would itself cause harm" that is protected by Exemption 7(A). *ACLU II*, 710 F.3d at 426 (quoting *Roth*, 642 F.3d at 1178). The FBI maintains that confirming or denying the existence of 302 reports would confirm or deny whether specific witnesses participated. Hardy Decl. ¶ 16. All of the FBI's predictions of harm seem to share this premise. *See id*. ¶¶ 13-16 (stating, *inter alia*, that "the FBI can neither confirm nor deny the existence of any specific witness accounts"). It does not appear that Plaintiffs requested the 302 report associated with any particular witness. *See* Am. Compl. at 50 (requesting "September 15th or 16th FBI 302 Interview Reports, and corresponding handwritten notes, of interviews conducted in Germany of United States personnel who had been in the Benghazi mission and the Benghazi CIA annex during the September 11th and 12th attacks on those facilities"). The premise that acknowledging the existence of any 302 report would necessarily reveal the existence of specific 302 reports may

Accuracy in Media, Inc. et al. v. Department of Defense, et al.

well be true, but it is unexplained.  The undersigned is mindful that the FBI's predictions of harm

are owed significant deference, but the undersigned cannot ignore this gap in the FBI's

explanation.  Thus, the undersigned recommends denying Defendants' motion without prejudice

with respect to the FBI's *Glomar* response so that Defendants can offer a more "logical or

plausible" explanation.  *ACLU II*, 710 F.3d at 427 (citation omitted); *see Santos v. DEA*, 357 F.

Supp. 2d 33, 38 (D.D.C. 2004) (ordering supplementation where previous agency affidavit did

not provide sufficient explanation).


### 2. The FBI Has Not Officially Acknowledged the 302 Reports

Plaintiffs' other challenge to the FBI's *Glomar* response—that the FBI has already

officially acknowledged the 302 reports in question—is unconvincing.  "[T]o overcome an

agency's *Glomar* response when relying on an official acknowledgement, 'the requesting

plaintiff must pinpoint an agency record that both matches the plaintiff's request and has been

publicly and officially acknowledged by the agency.'" *James Madison Project*, 302 F.Supp.3d at

21 (quoting *Moore*, 666 F.3d at 1333).  For this "official acknowledgement" doctrine to apply,

this Circuit requires that: "(1) the information requested must be as specific as the information

previously released; (2) the information requested must match the information previously

disclosed; and (3) the information requested must already have been made public through an

official and documented disclosure." *ACLU I*, 628 F.3d at 620-21 (citations omitted).

There is no indication that the 302 reports in question "have been made public through an

official and documented disclosure." *Id.*  The FBI asserts that it has "never acknowledged the

existence of the alleged FBI 302s, which are the subject of Plaintiffs' request. Nor has the FBI

ever made the alleged FBI 302s or the information purportedly contained therein available to the

26

Accuracy in Media, Inc. et al. v. Department of Defense, et al.

public." Hardy Decl. ¶ 7.  The closest that Plaintiffs get to official acknowledgement is a reference to FBI interviews in a Senate Committee Report:

> On September 15th and 16th, officials from the FBI conducted face-to face interviews in Germany of the U.S. personnel who had been on the compound in Benghazi during the attack. The U.S. personnel who were interviewed saw no indications that there had been a protest prior to the attack. Information from those interviews was shared on a secure video teleconference on the afternoon of the 16th with FBI and other IC officials in Washington; it is unclear whether the question of whether a protest took place was discussed during this video conference.

"Flashing Red: A Special Report On The Terrorist Attack At Benghazi," United States Senate Committee On Homeland Security And Governmental Affairs ("Senate Committee Report") 28 (Dec.30, 2012).  A footnote reveals that the Report's authors obtained this information from a "Committee member briefing[.]"  *Id.*  There is no indication that this briefing was open to the public, so any interviews could not have been "publicly and officially acknowledged by the agency."  *Moore*, 666 F.3d at 1333.  Plaintiffs' reference to a book-turned-movie concerning the Benghazi attack is even less compelling because there is no indication that the FBI itself released anything through the book or movie.  *See Wolf*, 473 F.3d at 378 ("An agency's official acknowledgment of information by prior disclosure, however, cannot be based on mere public speculation, no matter how widespread.").

Even if the FBI had acknowledged the existence of some interviews, confirming or denying the existence of the 302 reports would still not "match the information previously disclosed[.]"  *ACLU I*, 628 F.3d at 620-21.  There is a difference between acknowledging the existence of interviews and acknowledging the existence of 302 reports about the same interviews.  "This is not hair-splitting" because courts in this Circuit must have an "insistence on exactitude" in this context.  *James Madison Project*, 302 F. Supp. 3d at 29; *Wolf*, 473 F.3d at 378.  In *Nat'l Sec. Counselors v. CIA* ("*Nat'l Sec. Counselors I*"), 898 F. Supp. 2d 233 (D.D.C.

Accuracy in Media, Inc. et al. v. Department of Defense, et al.

2012), the court was faced with a similar question—whether an agency could issue a *Glomar*

response for "processing notes" that were associated with "referral memoranda and

correspondence" for the same practice. *Id.* at 289. The court concluded that even if the agency

acknowledged "referral memoranda and correspondence," the agency could issue a *Glomar*

response for the "processing notes" even if both sets of documents related to the same underlying

information because these were still "separate documents." *Id.* Thus, there is no "match" here

because a Congressional briefing which references interviews is "separate" from any possible

302 reports about interviews. *ACLU I*, 628 F.3d at 620-21; *Nat'l Sec. Counselors I*, 898 F.

Supp. 2d at 289. For the same reasons as discussed above, there is even less of a "match"

between a book-turned-movie about the Benghazi attacks and any possible 302 reports. *ACLU I*,

628 F.3d at 620-21. Thus, while undersigned recommends denying Defendants' motion as it

relates to the FBI's *Glomar* response, the undersigned does not recommend the official

acknowledgment doctrine as a basis for doing so.

## IV.    MOTION TO PROPOUND INTERROGATORY TO DOD

"It is well established that discovery is rare in FOIA cases." *Cole v. Rochford*, 285 F.

Supp. 3d 73, 76 (D.D.C. 2018). Discovery is only appropriate if a FOIA plaintiff "raises a

sufficient question as to the agency's good faith in searching for or processing documents" or

"agency affidavits do not provide information specific enough to enable [the plaintiff] to

challenge the procedures utilized." *Id.* (citations and internal quotation marks omitted) If a

FOIA plaintiff rests its request for discovery on "highly speculative criticism" of an agency's

search, the request must be denied. *Accuracy in Media, Inc. v. Nat'l Park Serv.*, 194 F.3d 120,

125 (D.C. Cir. 1999). In the rare event that discovery is appropriate, courts limit such discovery

Accuracy in Media, Inc. et al. v. Department of Defense, et al.

to the adequacy of an agency's search. *See Landmark Legal Found. v. EPA*, 959 F. Supp. 2d

175, 184 (D.D.C. 2013) (approving "limited" discovery into whether agency excluded agency

leaders from search); *Bangoura v. Dep't of Army*, Civ. No 05-0311, 2006 WL 3734164, at *6

(approving "limited discovery regarding the adequacy of Defendant's search"); *Citizens for

Responsibility & Ethics in Washington v. DOJ*, Civ. No. 05-2078(EGS), 2006 WL 1518964, at

*6 (D.D.C. June 1, 2006) (approving "limited discovery" including depositions of those involved

in processing the request at issue).  Thus, even where a FOIA plaintiff demonstrates bad faith,

the scope of discovery is limited to "the actions of the individuals who conducted the search." *In

re Clinton*, No. 20-5056, -- F.3d --, 2020 WL 4745104, at *6 (D.C. Cir. Aug. 14, 2020).

In addition to moving for summary judgment on all issues, Plaintiffs have moved for

leave to propound the following interrogatory to the DoD pursuant to Federal Rule of Civil

Procedure 56(d):

> State the times of all electronic, verbal, and written, communications, from 3:32 p.m.,
> through 3:00 a.m., by and among all DoD components, the total number of individuals on
> the communication, their titles and locations, and the substance of that communication.
> Include in your answer a description of all records, in any form, containing, reflecting, or
> otherwise corroborating, that communication.

*See* Pls.' Mem. at 35.

Plaintiffs do not deny that the affidavits submitted by the government were lacking in any

detail regarding the sufficiency of the DoD's search for responsive records.  *Id.* at 33.  Instead,

Plaintiffs contend that "plaintiffs have not been allowed to discover the facts of when, and by

what means, communications with assets were first made." *Id.*

The undersigned has already concluded that the DoD is entitled to "presumption of good

faith" because of its detailed explanation of its search and withholdings.  *Reporters Comm. for

Freedom of Press*, 877 F.3d at 402 (citation omitted).  In addition, the undersigned has

Accuracy in Media, Inc. et al. v. Department of Defense, et al.

concluded that Plaintiffs have not overcome this presumption of good faith.  In the discovery context, Plaintiffs' contentions fare no better, particularly because Plaintiffs concede that they do not "dispute the particulars of the DoD's search[.]"  Pls.' Mem. at 4.  This concession alone is fatal to Plaintiffs' discovery request because it shows that regardless of Secretary Panetta's actions or the exact timeline of events following the Benghazi attack, Plaintiffs do not "raise[] a sufficient question as to the agency's good faith in *searching for or processing documents*" or provide any basis to conclude that "agency affidavits do not provide information specific enough to enable [the plaintiff] to *challenge the procedures utilized*."  *Cole*, 285 F. Supp. 3d at 76 (citations omitted) (emphasis added).

Moreover, to the extent that Plaintiffs allege that the DoD acted in bad faith as a general matter, these claims are "highly speculative."  *Accuracy in Media*, 194 F.3d at 125.  It is unclear whether Plaintiffs actually allege bad faith issue because the words "bad faith" do not appear anywhere in Plaintiffs' briefing.  Plaintiffs nonetheless come close in doubting the DoD's official version of events.  As the undersigned has observed, "[f]ew cases in this Circuit address what is sufficient to demonstrate 'bad faith.'  Many more cases address what is not bad faith." *Khatchadourian v. Def. Intelligence Agency*, No. 1:16-CV-311-RCL/DAR, -- F. Supp. 3d --, 2020 WL 1309941, at *42 (D.D.C. Mar. 19, 2020) (collecting cases).

Plaintiffs' contentions about the DoD's inaccurate timeline of events do not meet this Circuit's standard because Plaintiffs' claims amount to a "mere allegation of agency misrepresentation[.]"  *Id.* (quoting *Hayden v. NSA/Cent. Sec. Serv.*, 608 F.2d 1381, 1387 (D.C. Cir. 1979)).  According to Plaintiffs, Secretary Panetta and others must have given orders prior to 3:00 am, and these orders must have been in writing.  ECF No. 75 at 2-3.  Plaintiffs' assertion rests on the assumption that, when Secretary Panetta said that his orders were later reduced to

Accuracy in Media, Inc. et al. v. Department of Defense, et al.

writing, he could not have been referencing the EXORD record that Plaintiffs have already

received. *Id.* Thus, according to Plaintiffs, there are "orders and communications that the DOD

now claims never existed" and these orders and communications must be in writing. *Id.*; Pls.'

Mem. at 4. In the absence of specific evidence to the contrary, Plaintiffs' insistence that their

assumptions and speculative assertions are true cannot rebut a presumption of good faith.

*Accuracy in Media*, 194 F.3d at 125. The undersigned notes that Plaintiffs' version of events is

particularly speculative because, even according to Plaintiffs' account, many orders prior to the

EXORD were not in written form. *See e.g.*, Pls.' Mem. at 30-32 (alleging stand-down orders that

were relayed over the phone). Thus, the undersigned recommends denial of Plaintiffs' Rule

56(d) request because Plaintiffs have not pointed to concrete evidence of "bad faith or illegality

with regard to the underlying activities which generated the documents at issue" or bad faith "in

searching for or processing documents[.]" *Khatchadourian*, 2020 WL 1309941, at *42 (quoting

*Jones v. FBI*, 41 F.3d 238, 242 (6th Cir. 1994)).

   Even if Plaintiffs could demonstrate that some discovery is appropriate here, Plaintiffs'

proposed interrogatory is not "limited discovery regarding the adequacy of Defendant's

search[.]" *Bangoura*, 2006 WL 3734164, at *6. Plaintiffs do not seek relevant information

concerning "the actions of the individuals who conducted the search." *In re Clinton*, 2020 WL

4745104, at *6. Instead, Plaintiffs seek the same information they sought in their prior FOIA

requests, in addition to information concerning "verbal" communications. Pls.' Mem. at 35.

With respect to all information that Plaintiffs sought through their original requests, this

discovery would be inappropriate because "courts must not grant FOIA plaintiffs discovery that

would be tantamount to granting the final relief sought." *Tax Analysts v. I.R.S.*, 410 F.3d 715,

722 (D.C. Cir. 2005) (citation and internal quotation marks omitted). Discovery regarding verbal

Accuracy in Media, Inc. et al. v. Department of Defense, et al.

communications would be especially inappropriate because FOIA does not require agencies to create records of verbal communications.  *Wilson v. Dep't of Transp*., 730 F. Supp. 2d 140, 150 (D.D.C. 2010) ( "FOIA does not require agencies to create or retain documents.").  Thus, even if some discovery were appropriate, the undersigned would nonetheless recommend denial of Plaintiffs' Rule 56(d) request.

Accuracy in Media, Inc. et al. v. Department of Defense, et al.

## V.      CONCLUSION

It is therefore, on this 27th day of August, 2020,

**RECOMMENDED** that Defendants' Motion for Summary Judgment (ECF. No. 68) be

**DENIED WITHOUT PREJUDICE** with respect to the FBI's *Glomar* Response, and

**GRANTED** in all other respects; and it is

**FURTHER RECOMMENDED** that Plaintiffs' Cross Motion for Summary Judgment

(ECF No. 71) be **DENIED** with respect to all issues except the FBI's *Glomar* Response; and it is

**FURTHER RECOMMENDED** that Defendants be **ORDERED** to produce a

supplemental declaration explaining the basis of the FBI's *Glomar* Response; and it is

**FURTHER RECOMMENDED** that Plaintiffs' Motion to Propound Discovery (ECF No.

73) be **DENIED**.


_____
DEBORAH A. ROBINSON
United States Magistrate Judge


**Within fourteen days, any party may file written objections to this report and
recommendation. The objections shall specifically identify the portions of the findings and
recommendations to which objection is made and the basis of each such objection. In the
absence of timely objections, further review of issues addressed herein may be deemed
waived.**